**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x
**MD ISLAM, on behalf of himself and those similarly situated,**

|  |  |
|---|---|
| **Plaintiff,** | Index No. |
|  | **COMPLAINT** |
| -against- | **JURY TRIAL DEMANDED** |
| **LYFT, INC.,** |  |
| **Defendant.** |  |

-------------------------------------------------------------------------x

Plaintiff MD Islam, on behalf of himself and those similarly situated, by and through his undersigned counsel Mirer Mazzocchi & Julien, and Zubin Soleimany, Esq., and upon personal knowledge as to himself and upon information and belief as to other matters, hereby alleges as follows:

## NATURE OF THE ACTION

Plaintiff brings this breach of contract action on behalf of himself and similarly situated New York City drivers who, in the period from on or about June 27, 2019 to the present, have been subjected to Lyft's unlawful practice, in violation of the driver agreement, of forcibly logging off Lyft drivers from the Lyft app if they perform fewer than 100, or 180 rides in a 30-day period.

## BACKGROUND

1.      In 2014, Lyft, Inc.. ("Lyft") began its New York City operations as a New York City Taxi and Limousine Commission ("TLC") licensed Black Car company, providing private for-hire vehicle transportation.

2.      Early on, Lyft recruited heavily among existing professional drivers and non-drivers alike.  Lyft touted the alleged flexibility of working for Lyft, advertising to potential drivers that they could choose their own hours and be their own boss.

3.      Lyft recruited an unlimited number of drivers, encouraging them to work full-time hours by enticing drivers with higher pay if they would work 30-50+ hours a week.  For example, for years after Lyft's entry into the New York market, Lyft promised drivers a "Power Driver Bonus," in which Lyft would cut its percentage commission or "Lyft Fee" by 50% for drivers who drove 30-49 hours per week, and would eliminate the commission entirely for drivers who drove 50 or more hours per week.

4.      In this way, the bargain was set: Lyft drivers could earn a decent living so long as they put in enough hours-- and anyone who wanted to could put in enough hours. With promises made and expectations set that signing up to work for Lyft meant full-time work for anybody who wanted it, drivers entered into long-term lease agreements for TLC-licensed for-hire vehicles and took on other significant expenses to work for Lyft.

5.      However, Lyft's push to recruit more and more drivers led to an oversaturation of the FHV ride market which threatened the ability of each driver to earn a decent living.

6.      Yet, because Lyft treated its drivers as independent contractors, the company had always been able to externalize the costs of its oversaturation.  If Lyft sold 150,000 trips a day, its revenue would be the same regardless of whether there were 25,000 or 50,000 Lyft drivers on the road; however, this oversaturation would leave each individual driver with less take-home pay.

7.      One result of this oversaturation was that, as the total available number of trips became diluted across an ever-growing pool of vehicles, app-based FHV drivers began working

for multiple app-based FHV services, in the hopes that by receiving dispatches from two or more companies, drivers would be more likely to receive more trip requests, thus reducing their unpaid downtime between trips.

8.     In doing so, a driver who may previously have spent 50 hours a week online for one company, and performed 65 trips, would now still work 50 hours per week, but, e.g., perform 40 trips for one company, and 30 trips for another company.

9.     By the summer of 2018, after a rash of driver suicides, including drivers of app-based FHV services, the City Council passed several laws to improve the plight of drivers and stem the tide of their declining income. Along with several other bills aimed at addressing the crisis in the taxi and FHV industry, the Council passed Local Law 147, which limited the further issuance of new vehicle licenses for FHVs, and Local Law 150, which empowered the TLC to promulgate rules governing earnings standards for drivers who work for high-volume FHV bases such as Uber and Lyft.

10.     Pursuant to Local Law 150, the TLC passed driver minimum pay regulation in the fall of 2018, with the aim of providing drivers with compensation of $17.22/hour, after all expenses, for all time that drivers spent "online," or logged on to apps, and either waiting to perform trips or performing trips.  Specifically, the TLC pay rules established minimum per mile and per-minute rates that high-volume for-hire vehicle companies such as Lyft would have to pay drivers for all trips performed.  *See*, 35 R.C.N.Y. § 59B-24. Driver pay rates would also be adjusted according to each company's "utilization rate," which is the percentage of time that a company's cars, when logged into the company's app, are actively transporting passengers.

11.     The TLC pay formula requires high-volume FHV bases to pay drivers rates that amount to $17.22/hour, plus expenses for every minute and mile of time a driver spends

performing a trip. In order to ensure that drivers are fairly compensated for the downtime between each trip, The TLC pay rule divides the payments for each mile and minute by the percentage utilization rate of the HVFHV base, effectively multiplying the per-mile and per-minute pay rates of each trip to effectively multiply hourly pay rates to cover the 42% empty time between trips. *Id*.

12.     Although Lyft sued the City of New York to enjoin implementation of TLC driver pay rules, the City prevailed and the driver pay rules went into effect in February 2019. *See, Tri-City, LLC v. New York City Taxi and Limousine Commission*, Index No. 151037 (Sup. Ct. N.Y. Co. Apr. 30, 2019), NYSCEF Doc. No. 73.

13.     After losing this lawsuit, on or about June 27, 2019, Lyft, in violation of its contract with drivers,  began to limit drivers' access to the app, in an apparent attempt to avoid its obligations under TLC rules to ensure that drivers earn a decent minimum wage for all hours that they are performing trips or are available to perform trips.

14.     Such actions violate the spirit, if not the letter, of TLC regulations intended to confer basic labor protections upon some of the City's most vulnerable low-wage workers.

15.     Crucially, the Lyft contracts specifically provide that drivers shall have no limitations on their ability of where and when to access the Lyft app.

16.     Thus,  Lyft's forced log-outs and restricted access to the Lyft app constitute a material breach of Lyft's contract with its drivers.

17.     Although Lyft had long had a practice of forcibly logging out drivers who did not respond to trip requests, indicating that they were not ready to perform work, Lyft had never previously suspended drivers who were ready, willing, and able to perform trips for Lyft.

18.     Lyft's forced logouts of its affiliated drivers amount to nothing less than short-term layoffs of workers who have come to depend on the availability of full-time work in order to meet their work expenses, let alone the cost of living in New York City.

19.     The effect of Lyft's unilateral shift in policies has been to significantly reduce the working hours of thousands of drivers overnight. These drivers are now earning hundreds of dollars less per week and may, if Lyft's breach of contract continues unchecked, cost drivers thousands of dollars per year in take-home pay.

## JURISDICTION AND VENUE

20.     Jurisdiction is proper as this Court under 28 U.S.C. § 1332 based on diversity of citizenship. The amount in controversy exceeds $75,000.

21.     Defendant Lyft is subject to personal jurisdiction in the State of New York as Lyft does business in New York.

22.     Venue is proper in this District because Defendant conducts business in this Judicial District, and the acts and/or omissions giving rise to the claims herein alleged took place in this District.

23.     Further, while Plaintiff is a New York City Lyft driver who did not successfully opt out of Lyft's arbitration clause, Plaintiff is exempt from having to arbitrate his claims under the provisions of the Federal Arbitration Act, 9 U.S.C. § 1, as he is a transportation worker engaged in interstate commerce.  *See, e.g.*, *Singh v. Uber Technologies., Inc.*, 939 F.3d 210 (3d Cir. 2019).

24.     As of 2019, any decision as to whether a class of workers is exempt from the FAA is for the Court, not an arbitrator, to decide. *See*, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532 (2019).

## PARTIES

## Plaintiff MD Islam

25.     Plaintiff Islam is a resident of Astoria, Queens County, New York, who has been a professional driver since 2002.

26.     Plaintiff Islam has worked as a Driver for Lyft since 2014.

27.     Plaintiff is a party to the contracts pursuant to which drivers receive dispatches from the Lyft app.

28.     Specifically, in the relevant period from June 27, 2019 to the present, Plaintiff Islam was a party to the February 2018 contract and is a party to the August 2019 contract with Lyft.

29.     Plaintiff Islam has not formally opted out of the arbitration provision of Lyft's contract.

30.     At all times relevant to this complaint, Plaintiff Islam was expected to and regularly did provide services in Interstate Commerce by driving passengers across state lines on a regular basis.

31.     While driving for Lyft, Plaintiff Islam typically crossed state lines in the course of his work on a weekly basis.

32.     Since January 15, 2020, Plaintiff Islam has performed fewer than 180 rides in a 30 day period.

33.     Plaintiff Islam has been subject to Lyft's limited-hours restrictions and forced log-off policies since on or about January 15, 2020, in violation of Lyft's contract with him.

**Defendant Lyft, Inc**

34.     Lyft, Inc. is a Delaware corporation, which is the corporate parent of the Lyft subsidiary black car bases, which dispatch trips to drivers in New York City.

35.     Lyft is a party to the contracts pursuant to which drivers receive dispatches from the Lyft app, which are the main "base agreement" between Lyft and drivers under TLC rules.

36.     Specifically, in the relevant period from June 27, 2019 to the present, Lyft required all New York City drivers to enter a February 2018 agreement, or an August 2019 agreement to drive for Lyft in New York City.

## COMMON FACTUAL ALLEGATIONS

### Lyft Has Structured Its New York City Business Such That Plaintiff And All New York City-based Lyft Drivers Are Engaged In Interstate Commerce

37.     Lyft's New York City business model is structured to provide not only transportation within New York City and New York State, but interstate transportation as well; Lyft's policies contemplate the regular performance of interstate transportation work by its drivers.

38.     Lyft has consistently advised drivers and passengers of its policy that a "$20 surcharge will be added to all trips between New York and New Jersey."

39.     Lyft has consistently advertised to passengers on its rider-facing New York City website that Lyft provides service from New York City to "EWR," that is, Newark International Airport.

40.     The same website also advises passengers that "Return tolls will be added to westbound trips through or across the Holland Tunnel, Lincoln Tunnel, George Washington Bridge, Goethals Bridge, and Outerbridge Crossing." All of these bridges and tunnels link New Jersey to New York.

41.     New York City-based Lyft drivers routinely transport passengers between New York and New Jersey.

42.     Specifically, in entering ride locations, passengers may choose any destination within 100 miles of their pick-up location, irrespective of the state of the destination.

43.     Lyft's policies state that trips originating in New York City may extend as far as 100 miles.

44.     Thus, New York City-based Lyft drivers may be dispatched to locations in New Jersey, Connecticut, or Pennsylvania.

45.     Once a driver receives a dispatch, Lyft specifies the pick-up location, but withholds the drop-off location until the passenger has entered the vehicle.

46.     Drivers are instructed that they will be penalized should they not accept a Lyft dispatch.  If a driver refuses a trip after learning of the destination, Lyft considers such a refusal to be a "cancellation."

47.     Lyft has maintained a deactivation policy, that stated that drivers' accounts could be deactivated for excessive cancellations.  Specifically, a tutorial provided for Lyft drivers states "If you cancel 15 or more of your last 100 accepted rides, not including passenger no-shows, your driver account could be at risk." Accordingly, no driver had the option to exclude performing interstate trips, without risking further exposure to deactivation.

48.     Thus, acceptance of interstate trips was a term and condition of Plaintiff's access to Lyft dispatches.

49.     Plaintiff Islam was required to perform interstate trips as a term and condition of his contract with Lyft.

50.     Plaintiff Islam did in fact perform interstate trips.

**The Lyft February 2018 and August 2019 Driver Contracts**

51.     In order to receive dispatches from Lyft, Plaintiff was required to electronically "accept" Lyft's "Terms of Service"  (hereafter "Contract") on his phone to use the Lyft app.

52.     In order to receive dispatches after Lyft issued a new or amended version of the Contract, a driver was required to agree to the new contract, which appeared on his or her phone, before any new dispatch could come in.

53.     All drivers were bound by contract with Lyft to provide driving services in exchange for payment by Lyft for those services.

54.     In the relevant period, Plaintiff and class members were bound by two contracts.

55.     As of June 27, 2019 at the start of the violation period Plaintiff, and all New York City Lyft drivers were bound by a contract dated February 8, 2018 ("the February 2018 Contract").

56.     Thereafter, in October 2019, Plaintiff and all New York City Lyft drivers were bound by a contract dated August 26, 2019 ("the August 2019 Contract"), though the contract was not introduced until October of that year.

57.     At present, the Lyft website shows a November 2019 contract, however drivers have not been required to accept such contract to access the Lyft app.

58.     Plaintiff anticipates he will be required to accept the November 2019 contract in order to continue driving for Lyft.

59.     The contracts frame the relationship between Lyft and the drivers as one between drivers seeking to perform "Rideshare Services," and Lyft which, expressly disclaiming its status as a transportation company, claims only that it is providing drivers access to a "marketplace" where they can offer their services as drivers.

60.     While the Contracts set forth various reasons for which Lyft may terminate the contract with a driver, or may "deactivate" a driver's account, for cause, nothing in the Contracts empowers Lyft to affirmatively limit a driver's access to the Lyft app when the driver's account status remains active.

61.     Indeed, all of the above contracts, including those Plaintiff is a party to, contain identical language regarding the drivers' right to access the Lyft app, and Lyft's policies surrounding temporary and permanent suspensions of drivers' accounts.

62.     Significantly, the Contracts explicitly disclaim any control by Lyft over when and where drivers may access the Uber app to receive dispatches. Section 19 of the Contracts reads, without ambiguity:

> "Lyft does not, and shall not be deemed to direct or control you generally or in your performance under this Agreement specifically, including in connection with your provision of Rideshare Services ...You retain the sole right to determine when, where and for how long you will utilize the Lyft Platform." [Section 19, the February 2018, August 2019 and November 2019 contracts]

**Lyft Violates Its Contracts With Drivers By Restricting Driver Work Hours and Forcibly Logging Off Drivers From the Lyft App**

63.     Beginning on or about June 27, 2019, in violation of Section 19 of the Contracts, which unambiguously state the drivers will have sole discretion over when and where to provide their services as drivers, Lyft began restricting drivers' access to the Lyft app.

64.     Specifically in June 2019, Lyft announced to its New York City drivers that it would eliminate drivers' sole discretion over where and when they log in to driver for Lyft, and would begin restricting the ability of drivers with active driver accounts to access the Lyft app.

65.     On or about June 24, 2019, Lyft emailed drivers informing of its new policies to limit driver access to the Lyft app, which Lyft claimed it was making in response to new TLC rules.

66.     In a blog post on the Lyft website titled, "What the New TLC Rules Mean for You," Lyft wrote that "Starting June 27, the number of drivers who can be on the road at any given time will be determined by passenger demand and spots may be limited. This means if there's low

demand, you may have to drive to busier areas or wait to go online and drive once demand picks back up." The blog post provided "tips" for how to be allowed onto the Lyft platform and stay on, instructing drivers to move to busier areas, but noting that, "if you haven't gotten a ride in 30 minutes, we may have to take you offline."

67.    The post also noted that drivers of wheelchair-accessible vehicles, drivers who lease their vehicles from Lyft, and drivers who maintain a 90% trip acceptance rate and had performed 100 trips within the previous 30 days would be exempt from Lyft's forced log-off policy.  Notably, Lyft provided drivers with only three (3) days advance notice of this policy, depriving drivers of sufficient advance notice to allow them to conform their behavior to the new policies, and avoid being subject to restricted working hours.

68.    On or about October 1, 2019, Lyft increased the trip number threshold for exempting drivers from the forced log-off policy from 100 trips within the previous 30 days, to 180 trips within the previous 30 days.  This change became effective on October 4, again depriving drivers of sufficient notice to allow them to attempt to qualify for the new threshold and avoid being subject to restricted working hours.

69.    The above policies amount to admissions of Lyft's breach of contract.

70.    Nor did these policy announcements amount to amendment of the contract.

71.    Indeed, Section 19 of the contracts remained the same in the contracts issued before and after the policy announcement.

72.    Further, Lyft, as the owner of the Lyft FHV bases, is subject to compliance with all TLC rules regulating bases and base owner conduct.

73.     Since in or about January 2019, TLC rules have set forth certain minimum requirements for contracts made between For-Hire Vehicle bases and their drivers, which TLC rules refer to as "base agreements."

74.     Specifically, 35 R.C.N.Y.  § 59B-18(f)(1), reads, in relevant part: "Agreements Must Include All Terms. Any terms or conditions a Driver or Vehicle Owner must accept or agree to in order to receive a dispatch from a For-Hire Base … must be included in a Base Agreement that complies with the provisions of this subdivision."

75.     Accordingly, under TLC rules, Lyft would be required to list any conditions drivers would be required to meet in order to receive a dispatch; yet, in violation of TLC rules, nowhere does the Contract impose the types of conditions and restrictions that limit drivers' access to the app that the Lyft has recently imposed.

76.     As a result of this illegal policy, drivers who would often receive work in the outer boroughs to start their day, now find themselves unable to log on until they reach Manhattan.

77.     Drivers who take a break in the middle of the shift to eat, re-fuel, or relieve themselves, have found themselves unable to log back in to the Lyft app after even brief log-offs, even in the middle of Manhattan.

78.     As a result of Lyft's breach of contract, many Lyft drivers have found themselves unable to work as many hours as they previously had, and their weekly Lyft earnings have decreased significantly.

79.     As a result of Lyft's breach of contract, Plaintiff and all similarly situated persons, putative Class Members, have been harmed in the amount of  all income from rides they would have received were they not denied access to the app.

80.    Specifically, Plaintiff and all similarly situated persons, putative Class Members, have been harmed at least in the amount of the number of hours they were subject to the logout multiplied by the TLC driver minimum pay rate of $17.22 per hour.

## INDIVIDUAL FACTUAL ALLEGATIONS

### Plaintiff Was/Is A Party The Relevant Contracts

81.    With his income as a driver, Plaintiff Islam supports himself, his wife, and his two minor children, and additionally, sends money back home.

82.    In 2014, Plaintiff Islam invested into the purchase of a new Toyota Camry to use as a for-hire vehicle.  While the vehicle is now paid off, he continues to pay $308 per month to maintain a commercial insurance policy for the vehicle.

83.    Plaintiff has driven for Lyft and been a party to various driver contracts with Lyft, from his first day driving for Lyft to the present.

84.    Plaintiff was a party to the February 2018 contract with Lyft, *supra*.

85.     Plaintiff is a party to the August 2019 contract.

86.    Before Lyft began restricting Plaintiff Islam's access to the Lyft app, in violation of its contract, Mr. Islam worked a full-time schedule driving for Lyft.

87.    For example, during the 10-week from October 7, 2019 to December 15, 2019, prior to Lyft subjecting Islam to forced log-offs and restricted access to the Lyft app, Islam averaged 93.8 trips per week, 39.51 online hours per week, and earned $1349.82 in average net pay from Lyft every week.

88.    Because, throughout this period, Islam had worked enough to average 180 trips over the previous 30-day period, the implementation of Lyft's forced log-off policy did not initially

affect Islam's ability access to the Lyft app and to work as much and whenever he wanted to, as guaranteed by the Agreements.

**January 20, 2020 To The Present: Plaintiff Has Performed Fewer Than 180 Trips Over 30 Days And Has Thus Been Subject To Lyft's Unlawful Log Off Policy In Violation Of Lyft's Contract With Him**

89.     On December 25, 2019, Islam left New York to visit his mother in Bangladesh, who had become seriously ill.

90.     Islam returned to New York on January 19, 2020 to find that, as a result of leaving New York to visit his mother, he was no longer able to access the Lyft app and work his previous full-time schedule. Because he did not perform 180 trips in the previous 30 days, Lyft had restricted his access to the app.

91.     On or about January 20, 2020, Plaintiff Islam emailed Lyft's customer support to explain why he had left New York, and asking Lyft to restore his access to the app.

92.     A Lyft support representative replied by merely providing information about Lyft's forced log-off policy.

93.     During this period, although Islam tried to work as much as he had previously, he could only get roughly half as many online hours as he previously had, and as a result, he earned significantly less take-home pay.

94.     Islam would open his app to go to work and find that he could not go online in Astoria, where he lives. The app would suggest that he go to busier areas to find passengers.

95.     Following this suggestion, Islam would go to midtown Manhattan to find passengers. Depending on the time of day, sometimes Lyft would allow him to log on, but sometimes it would not.

96.     On those occasions when he was able to be logged in, Islam was not able to work for very long.  A typical scenario would involve Mr. Islam performing several trips in Manhattan, for example, and then after completing a trip from Manhattan to the South Bronx,  Lyft would forcibly log Mr. Islam off, and leave him unable to receive more trips.

97.     Plaintiff Islam would try to work weekdays from 5-7 a.m., and often from 11pm - 5 am on Friday and Saturday nights, but would typically find himself logged off an hour or so after those periods had ended.

98.     On February 12, 2020, after learning that his sister in Bangladesh had fallen into a coma, Mr. Islam returned to Bangladesh.

99.     Mr. Islam's sister passed away on February 29, 2020.

100.    Mr. Islam flew back to New York on March 3, 2020 the day after his sister's funeral.

101.    Since returning to New York, Plaintiff Islam remained subject to Lyft's forced log-off policy until ridership declined precipitously in line with the COVID-19 pandemic, and Mr. Islam could no longer work.

**Plaintiff Islam Was And Is Harmed As A Result Of the Lyft's Breach Of Its Contract With Him**

102.    During the first three complete work weeks since becoming subject to Lyft's forced log-off policy, from January 20, 2020 to February 9, 2020 Islam averaged only 45.33 trips per week, 19.78 online hours per week, and earned only $612.80 in average net pay from Lyft per week.

103.    During this period, although Islam tried to work as much as he had previously, he was only able to be online for roughly 50% of his usual hours, perform less than half as many trips as he usually did, leaving him to earn only 45.4% of his typical earnings compared to the 10-week period prior to Lyft's imposition of forced logoffs.

104.    In the period since March 3, 2020, when Plaintiff returned to work after attending his sister's funeral, his earnings continued to be lower than they were when Lyft was not restricting his access to the app, in violation of the August 2019 contract, and he became unable to earn enough income to support himself and his family.

**CLASS ACTION ALLEGATIONS PURSUANT TO FRCP 23**

105.    Although Named Plaintiff has not opted out of the arbitration provision of the employment contract, the arbitration agreement is not binding on New York City Lyft drivers, regardless of whether or not they opted out of arbitration, as New York City Lyft drivers are transportation workers engaged in interstate commerce and thus exempt from section 1 of the Federal Arbitration Act.

106.    Named Plaintiff brings claims on behalf of himself and a class of Lyft drivers who, 1.) Are party to a Lyft contract; and 2.) drove for Lyft in New York City at any time between June 27, 2019 and the date of this filing ("the Relevant Period"); and 3.) at any time in the relevant period attempted to log on to the Lyft app and were rejected pursuant to the forced logoff policy.

107.    Plaintiff's claims are brought pursuant to Rule 23 of the Federal Rules of Civil Procedure (Fed. R. Civ. P.) so as to remedy violations of the contract discussed above.

108.    Plaintiff brings this case on behalf of himself and on behalf of all others similarly situated in New York, hereafter, the "class action Plaintiffs" as defined in paragraph 106, *supra*.

109.    Plaintiffs seek to represent a class of New York City Lyft drivers who have been subject to the contract violations set forth in this complaint for the period of in or about June 27, 2018 to the present  (hereafter the "class action period.").

110.    The class action Plaintiffs, at various times, electronically accepted Lyft's contract in order to receive Lyft dispatches.

111.    The class action Plaintiffs are readily ascertainable since the identity, addresses, and time and pay records of each such Class member are determinable from the Defendant's records.  Notice can be provided pursuant to Rule 23 of the Fed. R. Civ. P.

112.    Joinder of all Class members is impracticable. Upon information and belief, there are at least 30,000 or more Lyft drivers in New York City who could potentially be in the Class.

113.    The representative Plaintiff's claims are typical of those claims that could be alleged by any member of the class.  The relief sought by the Plaintiff is typical of the relief that would be sought by each member of the Class in separate actions.  All class action Plaintiffs were subject to forceable policies and practices alleged herein.  The aforesaid policies and practices of Defendants similarly affect all of the representative Plaintiffs and the class action Plaintiffs.  The Plaintiffs and members of the class they seek to represent have sustained similar injuries and damages as a result of Defendant's unlawful acts and/or omissions.

114.    The representative Plaintiff is fit to fairly and competently represent and protect the interests of the class action Plaintiffs.  For the purposes of this action, the named Plaintiff has no interest that conflicts with those of the class action Plaintiffs.   Representative Plaintiff's attorneys have considerable experience with class action litigation.

115.    Disposition of the claims as a class action is superior to any other available means of adjudication for the foregoing reasons:

116.    Class members are workers who individually lack the necessary resources to effectively litigate against a corporate defendant;

117.    A class action is in the interests of judicial economy as individual litigation would result in the expenditure of considerable public resources;

118.    Injuries suffered by each Class member individually are small in comparison to the cost of individual litigation, dissuading and precluding redress of their claims;

119.    The claims shared by Class members involve important public policy interests that would otherwise go unaddressed due to the aforesaid barriers to and limitations of individual litigation, and;

120.    A class action will provide anonymity for those Class members whose fear of retaliation would otherwise dissuade them from asserting their rights as many Class members are still driving by for the Defendants.

121.    Numerous questions of law and fact are common to all Class members and predominate over those of any individual Class member, including: Whether Defendant's forced log off policy announced on June 27, 2018 breached its contract with drivers.

## <u>CAUSE OF ACTION FOR BREACH OF CONTRACT</u>
### <u>(By Plaintiff and All Similarly Situated)</u>

122.    Plaintiff repeats, reiterates and incorporates each and every preceding paragraph as if set forth fully herein.

123.    Defendants' action and omissions, as alleged above, constitute independent and separate breaches of the contract entered into by Plaintiff.  These violations include Plaintiff's forcible logging off of Plaintiff from the Lyft app, and restricting drivers access to the Lyft app, depriving them of the ability to work, pursuant to the terms of the Contracts.

124.    As a direct and proximate result of Defendants' breaches, Plaintiff has been damaged in an amount as yet to be determined.

## <u>RELIEF SOUGHT</u>

**WHEREFORE,** Plaintiff requests relief as follows:

A.   An order declaring that Defendant has breached the Contract in the manners stated in this complaint;

B.   An award of damages for all breach of contract claims

C.   Interest as provided by law;

D.   Such other relief as this Court deems just and proper.

## JURY TRIAL

Plaintiffs demand a jury trial.

Dated New York, New York
     April 13, 2020

Respectfully Submitted,

*/s/ Zubin Soleimany*
Zubin Soleimany, Esq.
New York Taxi Workers Alliance
31-10 37th Ave. Ste. 300
Long Island City, NY 11101
(718) 706-9892
zsoleimany@nytwa.org
*Attorney for Plaintiff*

Jeanne Mirer, Esq.
Ria Julien, Esq.
Mirer Mazzocchi & Julien, PLLC
1 Whitehall St., 16th floor
New York, NY 10004
(212) 231-2235
rjulien@mmsjlaw.com
jmirer@mmsjlaw.com
*Attorneys for Plaintiff*