**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MOHAMMAD ISLAM, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>LYFT, INC.,<br><br>　　　　　　　　　　　　Defendant. | Case No. 1:20-cv-03004<br><br>District Judge Ronnie Abrams |

## LYFT, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND TO STAY LITIGATION

MAYER BROWN LLP

Matthew D. Ingber
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Tel.:  (212) 506-2500
Fax:  (212) 262-1910
mingber@mayerbrown.com

Archis A. Parasharami
MAYER BROWN LLP
1999 K Street N.W.
Washington, D.C. 20006
Tel.:  (202) 263-3328
Fax:  (202) 263-5328
aparasharami@mayerbrown.com

*Attorneys for Defendant Lyft, Inc.*

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................1

BACKGROUND .................................................................................................3

    A.    The Lyft Terms of Services Agreement.............................................3

    B.    The Features of The Arbitration Agreements. ...................................6

    C.    Mr. Islam Agrees to Arbitrate With Lyft On An Individual Basis. .................7

    D.    Mr. Islam Sues Lyft Notwithstanding His Arbitration Agreement.................7

ARGUMENT .....................................................................................................8

I.    THE FAA REQUIRES THE ENFORCEMENT OF MR. ISLAM'S
ARBITRATION AGREEMENT..............................................................8

    A.    Section 1 Of The FAA Does Not Exempt Mr. Islam's Arbitration
Agreement From The FAA's Reach.............................................9

        1.    Section 1's residual clause is limited to classes of workers engaged
in foreign or interstate commerce. ....................................10

        2.    The relevant "class of workers" is the class of rideshare drivers in
the United States. ...................................................12

        3.    As a class, rideshare drivers provide predominantly local
transportation services and are therefore not "engaged in foreign or
interstate commerce." ...............................................14

            a.    Lyft's records demonstrate that rides on its platform are
overwhelmingly local..........................................14

            b.    The nature and regulation of Lyft's Platform underscore
that drivers provide local transportation services. .................14

            c.    Local trips to or from airports and train stations do not
mean that the relevant "class of workers" is "engaged in"
interstate commerce for purposes of Section 1. .....................16

            d.    *Cunningham* and *Waithaka* do not support application of
the Section 1 exemption here.................................17

        4.    Rideshare drivers are not "engaged in foreign or interstate
commerce" for the additional and independent reason that they
primarily transport passengers rather than goods. ..............20

    B.    Mr. Islam's Arbitration Agreement Is Otherwise Fully Enforceable As A
Matter Of Federal Law.............................................22

        1.    Mr. Islam entered into a valid arbitration agreement.........................22

        2.    Mr. Islam's claim is within the scope of his arbitration agreement....23

II.    MR. ISLAM'S ARBITRATION AGREEMENT IS ALSO ENFORCEABLE
UNDER NEW YORK STATE LAW.......................................24

III.    THE CLAIMS AGAINST LYFT SHOULD BE STAYED PENDING
ARBITRATION. .......................................................25

i

CONCLUSION.........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allied-Bruce Terminix Cos. v. Dobson*,
    513 U.S. 265 (1995) ................................................................................................... 1

*AT&T Mobility LLC v. Concepcion*,
    563 U.S. 333 (2011) ........................................................................................... 1, 9, 13

*Aurora Taxi Co. v. Yellow Cab Mfg. Co.*,
    229 Ill. App. 641 (Ill. Ct. App. 1923) ................................................................ 16

*Burgos v. Northeast Logistics, Inc.*,
    2017 WL 10187756 (E.D.N.Y. Mar. 30, 2017) .................................................. 24

*Camilo v. Lyft, Inc.*,
    384 F. Supp. 3d 435 (S.D.N.Y. 2019) ............................................................... 23

*Capriole v. Uber Techs., Inc.*,
    2020 WL 2563276 (N.D. Cal. May 14, 2020) ............................................*passim*

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001) ......................................................................................*passim*

*Collins & Aikman Prods. Co. v. Bld. Sys., Inc.*,
    58 F.3d 16 (2d Cir. 1995) ................................................................................... 23

*Cunningham v. Lyft, Inc.*,
    2020 WL 1503220 (D. Mass. Mar. 27, 2020) .............................................. 17, 18

*Diaz v. Michigan Logistics, Inc.*,
    167 F. Supp. 3d 375 (E.D.N.Y. 2016) ............................................................ 3, 25

*Douglas v. U.S. Dist. Ct. for Cent. Dist. of Cal.*,
    495 F.3d 1062 (9th Cir. 2007) ........................................................................... 25

*Espinosa v. SNAP Logistics Corp.*,
    2018 WL 9563311 (S.D.N.Y. Apr. 3, 2018) ..................................................... 24

*First Options of Chicago, Inc. v. Kaplan*,
    514 U.S. 938 (1995) ........................................................................................... 22

*Gadson v. SuperShuttle Int'l*,
    2011 WL 1231311 (D. Md. Mar. 30, 2011) ...................................................... 21

*Gilmer v. Interstate/Johnson Lane Corp.*,
    500 U.S. 20 (1991) ............................................................................................. 25

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Gray v. Uber, Inc.*,
    2019 WL 1785094 (M.D. Fla. Apr. 10, 2019) ............................................................ 3, 20

*Green Tree Fin. Corp.-Alabama v. Randolph*,
    531 U.S. 79 (2000) .......................................................................................................... 9

*Grice v. Uber Techs., Inc.*,
    2020 WL 497487 (C.D. Cal. Jan. 7, 2020) ............................................................*passim*

*Heller v. Rasier, LLC*,
    2020 WL 413243 (C.D. Cal. Jan. 7, 2020) ............................................................*passim*

*Hill v. Rent-A-Ctr., Inc.*,
    398 F.3d 1286 (11th Cir. 2005) ..................................................................................... 15

*Illinois C. R. Co. v. Behrens*,
    233 U.S. 473 (1914) ...................................................................................................... 19

*Jamison v. Encarnacion*,
    281 U.S. 635 (1930) ...................................................................................................... 19

*Jetblue Airways Corp. v. Stephenson*,
    31 Misc. 3d 1241(A) (N.Y. Sup. Ct., N.Y. Cty. 2010) ................................................. 21

*Katz v. Cellco P'Ship*,
    794 F.3d 341 (2d Cir. 2015) .......................................................................................... 25

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*,
    137 S. Ct. 1421 (2017) .................................................................................................. 22

*Kowalewski v. Samandarov*,
    590 F. Supp. 2d 477 (S.D.N.Y. 2008) .............................................................. 3, 11, 21, 22

*Lake Shore & M. S. R. Co. v. State of Ohio*,
    173 U.S. 285 (1899) ...................................................................................................... 22

*Louisville & N.R. Co. v. E. Tennessee, V. & G. Ry. Co.*,
    60 F. 993 (6th Cir. 1894) .............................................................................................. 22

*Mendoza v. Uber Techs. Inc.*,
    2020 WL 2563273 (C.D. Cal. Mar. 25, 2020) ............................................................... 9

*Meyer v. Uber Techs., Inc.*,
    868 F.3d 66 (2d Cir. 2017) ............................................................................................ 22

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) ............................................................................................................ 9

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*New Prime Inc. v. Oliveira*,
   139 S. Ct. 532 (2019) ................................................................................. 10

*O'Dean v. Tropicana Cruises Intern., Inc.*,
   1999 WL 335381 (S.D.N.Y. May 25, 1999) ................................... 24

*Palcko v. Airborne Express, Inc.*,
   372 F.3d 588 (3d Cir. 2004) .......................................................... 18

*Pelayo v. Platinum Limousine Servs., Inc.*,
   2015 WL 9581801 (D. Haw. Dec. 30, 2015) ................................... 20

*New York ex rel. Pennsylvania Railroad v. Knight*,
   192 U.S. 21 (1904) ....................................................................... 17

*Ranieri v. Bell Atl. Mobile*,
   304 A.D.2d 353 (1st Dep't 2003) .................................................. 25

*Rogers v. Lyft*,
   2020 WL 1684151 (N.D. Cal. Apr. 7, 2020) ............................*passim*

*Scaccia v. Uber Techs.*,
   2019 WL 2476811 (S.D. Ohio June 13, 2019) ................................ 20

*Shanks v. Del., Lackawanna & W. R.R.*,
   239 U.S. 556 (1916) ..................................................................... 19

*Sienkaniec v. Uber Techs., Inc.*,
   401 F. Supp. 3d 870 (D. Minn. May 16, 2019) ............................... 21

*Singh v. Uber Techs., Inc.*,
   939 F.3d 210 (3d Cir. 2019) ................................................ 12, 21, 22

*Stewart Taxi Serv. Co. v. Getz*,
   84 A. 338 (Md. 1912) ................................................................... 17

*The Taxicab Cases*,
   143 N.Y.S. 279 (N.Y. Sup. Ct., New York Cnty. 1913) ................... 17

*Tsadilas v. Providian Nat'l Bank*,
   13 A.D.3d 190 (1st Dep't 2004) .................................................... 25

*United States v. Yellow Cab Co.*,
   332 U.S. 218 (1947) ................................................................. 16, 18

*Valdes v. Swift Transp. Co., Inc.*,
   292 F. Supp. 2d 524 (S.D.N.Y. 2003) ........................................... 24

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Vargas v. Delivery Outsourcing, LLC,*
  2016 WL 946112 (N.D. Cal. Mar. 14, 2016) ................................................................ 16

*Waithaka v. Amazon.com, Inc.,*
  --- F. 3d ---- (1st Cir. July 17, 2020) .......................................................... 18, 19

*Wallace v. Grubhub Holdings Inc.,*
  2019 WL 1399986 (N.D. Ill. Mar. 28, 2019) ................................................................ 13

*Whitman v. Am. Trucking Ass'ns,*
  531 U.S. 457 (2001) ............................................................................................................ 17

**Statutes**

9 U.S.C. § 1 .................................................................................................................... *passim*

9 U.S.C. § 2 ............................................................................................................................. 8

9 U.S.C. § 3 ........................................................................................................................... 25

NY CPLR § 7503(a) .............................................................................................................. 25

**Other Authorities**

Black's Law Dictionary (2d ed. 1910) .................................................................................. 10

The Century Dictionary & Cyclopedia (1914) ..................................................................... 11

Lyft Help Center, *Coverage Areas* ....................................................................................... 15

Lyft Help Center, *State and City Driver Info* ...................................................................... 15

"Lyft Kicks Off Massive Expansion, Launching 40 Cities," Lyft Blog (Jan. 26,
  2017) .................................................................................................................................... 15

Tex. A&M Transp. Inst., *Transportation Network Company (TNC) Legislation* .................. 15

Webster's New International Dictionary (1st ed. 1909) ........................................................ 10

## INTRODUCTION

Plaintiff MD Islam, also known as Mohammad Islam, is a rideshare driver who uses the Lyft Platform and who agreed to arbitrate his disputes with Lyft, Inc. ("Lyft") on an individual basis. Notwithstanding that agreement, Mr. Islam seeks to pursue a putative class action in court.

The Court should compel Mr. Islam to arbitrate his claim in accordance with his agreement. The Federal Arbitration Act, 9 U.S.C. §§ 1-16 ("FAA"), embodies a "liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quotation marks omitted).

Perhaps recognizing that fact, Mr. Islam seeks to avoid the FAA's coverage. Specifically, Mr. Islam contends that even though he agreed to the arbitration provision in Lyft's Terms of Service Agreement—the same agreement on which he bases his claims—he should not be held to his obligation to arbitrate because, in his view, he is "a transportation worker engaged in interstate commerce." Compl. ¶ 23. Mr. Islam relies on Section 1 of the FAA, which exempts from the statute's coverage a narrow category of "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1.

But Section 1 does not permit Mr. Islam to avoid arbitration for several reasons.

*First*, Mr. Islam's attempt to expand the Section 1 exemption conflicts with the Supreme Court's holding that the exemption requires a "narrow construction." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 118 (2001). That "narrow construction" is required because the exemption "is contained in a statute that 'seeks broadly to overcome judicial hostility to arbitration agreements.'" *Id.* at 118-19 (quoting *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 272-73 (1995)).

*Second*, the Section 1 inquiry asks "not whether the ***individual*** worker actually engaged in interstate commerce, but whether the ***class of workers*** to which the complaining worker belonged engaged in interstate commerce." *Rogers v. Lyft*, 2020 WL 1684151, at *5 (N.D. Cal. Apr. 7,

2020) (quotation marks omitted).  In this case, the relevant class of workers is rideshare drivers nationwide—or, at the very least, drivers using the Lyft Platform nationwide.  Thus, Mr. Islam cannot circumvent the FAA by alleging that he personally crossed state lines on occasion while using the Lyft Platform; nor can he gerrymander the inquiry to focus only on the activity of New York City rideshare drivers.

*Third*, once the class of workers is defined properly, it is clear that drivers using rideshare platforms like Lyft and Uber are not members of an "other class of workers engaged in foreign or interstate commerce"—the relevant language in Section 1.  That language is a "residual phrase, following, in the same sentence, explicit reference to 'seamen' and 'railroad employees.'"  *Circuit City*, 532 U.S. at 114 (emphasis added).  Accordingly, to fall within the exemption, the type of "other class of workers" subject to the exemption must parallel the occupations listed in the statute (seamen and railroad workers).  Yet drivers using rideshare platforms like Lyft to provide predominantly local transportation are not comparable to railroad or maritime workers.  The Lyft Platform functions locally and chiefly on a city-by-city basis, and it is therefore unsurprising that virtually all of the rides provided via Lyft's Platform—***about 98 percent of them***—do not involve traveling from one state to another.

Indeed, because of the intensely local nature of rideshare services, a growing majority of district courts to consider the issue have held that rideshare drivers are not "engaged in interstate commerce" for Section 1 purposes.  *See, e.g.*, *Capriole v. Uber Techs., Inc.*, 2020 WL 2563276 (N.D. Cal. May 14, 2020); *Rogers*, 2020 WL 1684151; *Heller v. Rasier, LLC*, 2020 WL 413243 (C.D. Cal. Jan. 7, 2020); *Grice v. Uber Techs., Inc.*, 2020 WL 497487 (C.D. Cal. Jan. 7, 2020).  As Judge Chhabria put it in *Rogers*, rideshare drivers are "in the general business of giving people rides, not in the particular business of offering interstate transportation services."  2020 WL 1684151, at *5.  In other words, rideshare drivers are not "part of a group that ***routinely***" transports goods or persons across state lines; instead, they engage in "activities [that] were intensely local."

2

*Heller*, 2020 WL 413243, at *8 (emphasis added); *accord Grice*, 2020 WL 497487, at *8.

*Fourth*, rideshare drivers primarily provide rides to **passengers** over short distances, while railroad and maritime work generally involves the transportation of **goods** over long distances. That distinction between goods and passengers has led many district courts to conclude that rideshare drivers fall outside the Section 1 exemption. *See, e.g.*, *Heller*, 2020 WL 413243, at *7 (citing, *inter alia*, *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477, 485 (S.D.N.Y. 2008) (holding that the Section 1 exemption does not apply to black car drivers)); *Grice*, 2020 WL 497487, at *7; *Gray v. Uber, Inc.*, 2019 WL 1785094, at *2 (M.D. Fla. Apr. 10, 2019).

Finally, even if Mr. Islam could invoke the Section 1 exemption—and he cannot—his arbitration agreement would still be enforceable under New York law. *See, e.g.*, *Diaz v. Michigan Logistics, Inc.*, 167 F. Supp. 3d 375, 381 (E.D.N.Y. 2016) (holding that arbitration agreement was enforceable under New York law even "assuming that the FAA does not apply").

In short, Mr. Islam should be held to the terms of his arbitration agreement with Lyft, and this Court should compel him to arbitrate his claims against Lyft on an individual basis.

## BACKGROUND

### A.    The Lyft Terms of Services Agreement

Defendant Lyft, Inc. operates a mobile-based ridesharing marketplace platform (the "Lyft Platform") that matches people who seek rides to certain destinations (riders) with people willing to drive to or through those locations (drivers).  Decl. of Neil Shah ¶ 3.  The Lyft Platform includes, among other things, Lyft's website, technology platform, and mobile phone application (the Lyft App).  *Id.*  Using the Lyft App, Lyft offers information and a method to connect drivers and riders with each other and to permit communication between riders and drivers.  *Id.*  Lyft does not itself provide rides or hire drivers to provide rides.  *Id.*

Before using the Lyft Platform (including the Lyft App), users must consent to Lyft's Terms of Service Agreement, which describes the terms and conditions on which Lyft offers both

riders and drivers access to the Lyft Platform.  Shah Decl. ¶ 5.  Drivers must also consent to the Driver Addendum.  *Id.*  Users consent to Lyft's Terms of Service Agreement as part of the registration process (*id.*) and when Lyft updates its Terms of Service Agreement (*id.* ¶ 6).  Plaintiff Mohammed Islam has agreed most recently to the version of Lyft's Terms of Service Agreement that was effective August 26, 2019 under the process described below.

When Lyft updates its Terms of Service Agreement, registered Lyft users who open the Lyft App are required to indicate their acceptance of the updated agreement, which automatically appears on a screen in the App.  *Id.* ¶ 7.  Once presented with that screen, users can scroll all the way through the text of the entire updated Terms of Service Agreement.  *Id.* ¶ 8.  The top of the screen informs users that, "Before you can proceed you must read and agree to Lyft's Terms of Service."  *Id.* ¶ 7.  At the bottom of the screen is a button with the words "I agree."  *Id.*  Drivers presented with this screen are required to select the "I Agree" button in order to proceed to offer rides through the Lyft App.  *Id.* ¶ 9.  Once a driver previously registered with the Lyft Platform is presented with this screen, it will continue to appear each time the driver opens the Lyft App until the driver clicks the "I Agree" button.  *Id.*  Lyft automatically records the date and time when a user clicks the "I Agree" button.[1]

The second paragraph of both the August 26, 2019 and February 6, 2018 Terms of Service Agreements alert users that the terms contain an arbitration provision, stating:

> PLEASE BE ADVISED: THIS AGREEMENT CONTAINS PROVISIONS THAT GOVERN HOW CLAIMS YOU AND LYFT HAVE AGAINST EACH OTHER CAN BE BROUGHT (SEE SECTION 17 BELOW).  THESE PROVISIONS WILL, WITH LIMITED EXCEPTION, REQUIRE YOU TO SUBMIT CLAIMS YOU HAVE AGAINST LYFT TO BINDING AND FINAL ARBITRATION ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS, GROUP OR REPRESENTATIVE ACTION OR PROCEEDING.

Shah Decl. Ex. 1, at 1; Ayanbule Decl. Ex. 1, at 1.  The same paragraph also alerts drivers of the

---

[1]    Drivers using Lyft's Platform, including Mr. Islam, followed a virtually identical process to consent to the version of Lyft's Terms of Service that was effective February 6, 2018.  *See* Decl. of Oluwabukunmi Ayanbule ¶¶ 4-6.

"OPPORTUNITY TO OPT OUT OF ARBITRATION." Shah Decl. Ex. 1, at 1; Ayanbule Decl. Ex. 1, at 1.

The arbitration agreement itself requires the driver and Lyft to resolve "ALL DISPUTES AND CLAIMS BETWEEN US" through binding arbitration on an individual basis. Shah Decl. Ex. 1 § 17(a); Ayanbule Decl. Ex. 1 § 17(a). The agreement expressly includes claims "arising out of or relating to:" "this Agreement and prior versions thereof," "the Lyft Platform," "your relationship with Lyft," "payments made by you or any payments made or allegedly owed to you," "compensation," and "expense reimbursement." *Id*. The agreement also expressly includes claims arising out of or relating to "breach of any express or implied contract or covenant." *Id.*[2] And the arbitration agreement specifies that "YOU AND LYFT MAY EACH BRING CLAIMS AGAINST THE OTHER ONLY IN AN INDIVIDUAL CAPACITY AND NOT ON A REPRESENTATIVE BASIS." *Id.* § 17(b).

The arbitration agreements also include an opt-out provision, listed under the bolded heading: "**Opting Out of Arbitration for Driver Claims That Are Not In a Pending Settlement Action**." Shah Decl. Ex. 1 § 17(j). That section informs drivers and driver applicants that they "may opt out of the requirement to arbitrate Driver Claims" by mail or e-mail "within 30 days of

---

[2]    The arbitration agreement contains the following limited enumerated exceptions, which are not applicable here:

> (1) small claims actions brought on an individual basis that are within the scope of such small claims court's jurisdiction; (2) a representative action brought on behalf of others under PAGA or other private attorneys general acts, to the extent the representative PAGA Waiver in Section 17(c) of such action is deemed unenforceable by a court of competent jurisdiction under applicable law not preempted by the FAA; (3) claims for workers' compensation, state disability insurance and unemployment insurance benefits; and (4) claims that may not be subject to arbitration as a matter of generally applicable law not preempted by the FAA.

Shah Decl. Ex. 1 § 17(g); Ayanbule Decl. Ex. 1 § 17(g).

the date this Agreement is executed by you." *Id.*[3]  The opt out provisions makes clear, however,

that if the driver has "previously agreed" to an "arbitration provision" with Lyft, the opt out applies

only to "any revisions to your prior arbitration agreement" and "has no effect on any previous,

other, or future arbitration agreements that you may have with Lyft." *Id.*

> ### B.    The Features of The Arbitration Agreements.

The arbitration provision in the versions of the Lyft Terms of Service Agreement discussed

above includes several features that ensure that users of the Lyft Platform (including riders and

drivers) have a simple and efficient means of resolving any disputes:

- **Potential $1,000 minimum award**: If the user participates in Lyft's optional pre-arbitration negotiation process and the arbitrator issues an award in favor of a user that is greater than "Lyft's last written settlement offer," then Lyft will pay the user $1,000 rather than any smaller arbitral award;

- **Small claims court option**: Either party may bring a claim in small claims court as an alternative to arbitration;

- **Flexible consumer procedures**: Arbitration will be conducted under the AAA's Consumer Arbitration Rules;

- **Conveniently located hearing**: Arbitration will take place "in the county in which the Driver provides Services" (or, for riders, in the county of the rider's billing address); and

- **Full individual remedies available**: The arbitrator can award "any individualized remedies that would be available in court," including statutory and punitive damages, attorneys' fees, and injunctions that would affect the claimant alone.

---

[3]     The Terms of Service Agreement defines "Driver Claims" to include claims "brought by Lyft against a Driver" or "brought by a Driver against Lyft" that:

> (A) are based on an alleged employment relationship between Lyft and a Driver; (B) arise out of, or relate to, Lyft's actual deactivation of a Driver's User account or a threat by Lyft to deactivate a Driver's User account; (C) arise out of, or relate to, Lyft's actual termination of a Driver's Agreement with Lyft under the termination provisions of this Agreement, or a threat by Lyft to terminate a Driver's Agreement; (D) arise out of, or relate to, Fares (as defined in this Agreement, including Lyft's commission or fees on the Fares), tips, or average hourly guarantees owed by Lyft to Drivers for Rideshare Services, other than disputes relating to referral bonuses, other Lyft promotions, or consumer-type disputes, or (E) arise out of or relate to background checks performed in connection with a user seeking to become a Driver.

Shah Decl. Ex. 1 § 17(e)(2); Ayanbule Decl. Ex. 1 § 17(e)(2).

*See* Shah Decl. Ex. 1 § 17(d)-(f); Ayanbule Decl. Ex. 1 § 17(d)-(f).

**C.    Mr. Islam Agrees to Arbitrate With Lyft On An Individual Basis.**

As Mr. Islam acknowledges in his complaint, he has agreed to Lyft's Terms of Service Agreement on multiple occasions during the relevant period. Compl. ¶¶ 27-28, 83-85. Most recently, Mr. Islam consented at least once in 2018 and six times in 2019 to the Terms of Service Agreement through the process described above. Shah Decl. ¶ 13. For example, on September 8, 2019, Mr. Islam consented to the version of Lyft's Terms of Service Agreement that was promulgated effective August 26, 2019. *Id.*

Mr. Islam also agreed to Lyft's Terms of Service Agreement on November 7, 2019 and November 25, 2019. *Id.* Lyft records show that Mr. Islam sent a request to opt out of the arbitration provision on November 14, 2019. Decl. of Jeannie Lieu ¶ 10. But that request came over two months after Mr. Islam first consented to the August 26, 2019 Terms of Service Agreement. And as explained above, these opt outs did not affect Mr. Islam's "previous . . . arbitration agreements" with Lyft. Accordingly, Mr. Islam is bound by the arbitration provision in Lyft's August 26, 2019 Terms of Service Agreements. And even if he were not, he would be bound by the similar arbitration provision in the February 6, 2018 Terms of Service Agreement.

Recognizing these facts, Mr. Islam acknowledges multiple times in his Complaint that he "did not successfully opt out of Lyft's arbitration clause." Compl. ¶¶ 23, 29, 105.

**D.    Mr. Islam Sues Lyft Notwithstanding His Arbitration Agreement.**

Mr. Islam filed this putative class action on April 13, 2020. Dkt. No. 1. The complaint asserts a single breach of contract claim alleging that Lyft breached the February 6, 2018 and August 26, 2019 Terms of Service Agreements by introducing what Mr. Islam characterizes as "limited hours restrictions" and "forced logoff" policies, which he contends went into effect in June 2019 and limit access to Lyft's platform for drivers who fail to give a certain number of rides on Lyft's platform within a 30-day period. Compl. ¶¶ 13-19, 63-80, 122-24.

Mr. Islam seeks to represent a putative class of drivers using Lyft's Platform that have driven on Lyft's Platform "in New York City at any time between June 27, 2019" and April 13, 2020 and who have "attempted to log in to the Lyft app and were rejected pursuant to the forced logoff policy." Compl. ¶ 105.

As we explain below, the group of individuals that Mr. Islam seeks to represent in this litigation is distinct from the broader term "class of workers" within the meaning of Section 1.[4]

## ARGUMENT

### I.    THE FAA REQUIRES THE ENFORCEMENT OF MR. ISLAM'S ARBITRATION AGREEMENT.

Mr. Islam's claims against Lyft must be arbitrated in accordance with his arbitration agreement. Unless the narrow exemption under Section 1 applies—and it does not here—the FAA governs any arbitration agreement that is "written" and in a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2. Both criteria are met here: (i) the arbitration provisions are in writing (*see* pages 3-6); and (ii) contracts governing the use of an Internet-based application plainly "involv[e] commerce" within the broader meaning employed by Section 2 of the FAA.[5] Moreover, the arbitration provisions specify that they are "governed by the Federal Arbitration Act." Shah Decl. Ex. 1 § 17(a); Ayanbule Decl. Ex. 1 § 17(a).

Under the FAA, Mr. Islam's arbitration agreement is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.

---

[4]    Mr. Islam is also a plaintiff in another case filed at approximately the same time. *See Haider v. Lyft, Inc.*, No. 20-cv-2997 (S.D.N.Y.) (Nathan, J.). Lyft is moving to compel arbitration of Mr. Islam's claims in that case as well. Plaintiffs have not sought to designate the cases as related, and Lyft does not believe that the cases meet the standards to qualify as related cases under Rule 13 of the Southern District of New York's Rules for the Division of Business Among District Judges.

[5]    As detailed further below, Section 2's coverage of contracts that "evidence a transaction involving commerce" reaches to the fullest extent of Congress's power to regulate interstate commerce, whereas the Section 1 exemption for an "other class of workers engaged in foreign or interstate commerce" is "afforded a narrow construction" and has "a more limited reach." *Circuit City*, 532 U.S. at 115, 117-18.

§ 2.  As the Supreme Court has explained, "[t]he overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Concepcion*, 563 U.S. at 344.  And this "'liberal federal policy favoring arbitration agreements'" applies "'notwithstanding any state substantive or procedural policies to the contrary.'" *Id.* at 346 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)).

Here, the FAA governs because Mr. Islam cannot show that Section 1's narrow exemption applies to his arbitration agreement.  And no grounds "exist at law or in equity for the revocation of" the agreement.  As explained below (at 22-24), Mr. Islam validly agreed to arbitration, and the arbitration agreement plainly covers the claims asserted in this lawsuit.

### A.    Section 1 Of The FAA Does Not Exempt Mr. Islam's Arbitration Agreement From The FAA's Reach.

In an effort to evade his arbitration agreement with Lyft, Mr. Islam points (Compl. ¶¶ 23, 105) to Section 1 of the FAA, which "excludes from the Act's coverage 'contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." *Circuit City*, 532 U.S. at 109 (quoting 9 U.S.C. § 1).

Mr. Islam, as "the party resisting arbitration," has the burden to prove that the Section 1 exemption applies here.  *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 91-92 (2000); *see also, e.g.*, *Capriole*, 2020 WL 2563276, at \*6; *Rogers*, 2020 WL 1684151, at \*4.  Mr. Islam is neither a railroad nor maritime worker, so Mr. Islam can satisfy his burden only if he demonstrates that he is a member of an "other class of workers engaged in foreign and interstate commerce." He cannot meet that burden.  Instead, as many other district courts have held, the Section 1 exemption does not apply to drivers who use rideshare platforms.  *See Capriole*, 2020 WL 2563276; *Rogers*, 2020 WL 1684151; *Mendoza v. Uber Techs. Inc.*, 2020 WL 2563273 (C.D. Cal. Mar. 25, 2020), *report and recommendation adopted*, 2020 WL 2563047 (C.D. Cal. May 4, 2020); *Heller*, 2020 WL 413243; *Grice*, 2020 WL 497487.

### 1. Section 1's residual clause is limited to *classes* of workers *engaged in* foreign or interstate commerce.

Section 1's residual clause is a narrow one. Indeed, the Supreme Court has held that the Section 1 exemption requires a "narrow construction" (*Circuit City*, 532 U.S. at 117-18) and should be interpreted in accordance with its "meaning at the time of the [FAA]'s adoption in 1925" (*New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019)). The text and history of the statute reveals that the Section 1 exemption was intended to apply only to *classes* of workers who— as a collective group—perform work "similar in nature" to "seamen" and "railroad employees," *i.e.*, work that "*routinely*" involves transportation across state lines, rather than predominantly local transportation. *Heller*, 2020 WL 413243, at *8 (emphasis added); *Grice*, 2020 WL 497487, at *8.

The Section 1 residual clause does not apply to workers who are merely "involved" in interstate commerce. Rather, as the Supreme Court explained in *Circuit City*, "[t]he plain meaning of the words 'engaged in commerce' is narrower than the more open-ended formulations 'affecting commerce' or 'involving commerce.'" 532 U.S. at 118. To be a member of a "class of workers engaged in . . . interstate commerce" as those words were defined by common usage and legal dictionaries in 1925 meant to be a member of a class of workers whose work typically consists of transportation across state lines. To begin with, the word "engaged" had (and continues to have) a meaning far narrower than "affecting" or "involving." *See Circuit City*, 532 U.S. at 118. To be "engaged" in an activity meant to be "occupied" or "employed" at it. Webster's New International Dictionary (1st ed. 1909); *see also* Black's Law Dictionary 425 (2d ed. 1910) (defining "engagement" as "[a] contract" or "obligation"). "Interstate commerce," in turn, referred to actual movement across state lines. Black's Law Dictionary, for example, defined "interstate commerce" as "commerce between two states," specifically—"traffic, intercourse, commercial trading, or [] transportation" "between or among the several states of the Union, or from or between points in one state and points in another state." Black's Law Dictionary 651 (2d ed. 1910). Another contemporaneous legal encyclopedia defined "interstate commerce" as "commercial transactions

10

. . . between persons resident in different States of the Union, or carried on by lines of transport extending into more than one State." The Century Dictionary & Cyclopedia (1914).

Thus, putting these components together, "[t]he narrower meaning of 'engaged in foreign or interstate commerce' dictates that only those classes of workers that" typically engage in transportation "across state lines (or international boundaries) can qualify for the exemption." *Rogers*, 2020 WL 1684151, at *5; *see also Capriole*, 2020 WL 2563276, at *7.

Moreover, the Supreme Court in *Circuit City* explained that the residual category of "workers engaged in foreign and interstate commerce" must be "controlled and defined by reference to the enumerated categories of workers which are recited just before it"—namely, "seamen" and "railroad employees." 532 U.S. at 115. Unlike rideshare drivers, these groups were already subject at the time of the FAA's enactment to separate dispute-resolution procedures under federal law that Congress "did not wish to unsettle." *Id.* at 114-15, 121. The Court recognized that it was "rational for Congress to ensure that workers in general would be covered by the provisions of the FAA, while reserving" narrow categories of workers who would be covered by other "more specific legislation" governing dispute resolution. *Id.* at 121. These same considerations do not apply to local transportation providers like rideshare drivers, who were not subject to this level of federal regulation. *See* pages 14-15, *infra* (discussing state and local regulation of rideshare companies and drivers); *cf. Kowalewski*, 590 F. Supp. 2d at 485 (S.D.N.Y. 2008) ("[T]he exemption in the FAA for railroad employees and seamen was motivated by a desire not to upset pre-existing or developing statutory schemes in those areas. Here, unlike in *Circuit City*, there is no suggestion that applying the FAA to the Black Car industry would upset any pre-existing or developing statutory scheme.").

*Circuit City* further explained that reading the residual clause narrowly and in connection with the terms "seamen" and "railroad employees" follows from "application of the maxim *ejusdem generis*, the statutory canon that where general words follow specific words in a statutory

enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Id.* at 114-15 (quotation marks omitted). Because, as a class, rideshare drivers do not satisfy that standard, Section 1 does not exempt Mr. Islam's arbitration agreement from the FAA's coverage.

### 2. The relevant "class of workers" is the class of rideshare drivers in the United States.

As explained above, Section 1's residual clause applies to *classes* of workers, not individual workers. Accordingly, "the question posed by the exemption is not whether the individual worker actually engaged in interstate commerce, but whether the *class* of workers to which the complaining worker belonged engaged in interstate commerce." *Rogers*, 2020 WL 1684151, at *5 (emphasis added; quotation marks omitted); *see also Singh v. Uber Techs., Inc.*, 939 F.3d 210, 227 (3d Cir. 2019) ("[T]he inquiry regarding § 1's residual clause asks a court to look at *classes* of workers rather than *particular* workers") (emphasis added).

Notwithstanding the clear instruction in the statutory language to look at the "class of workers," Mr. Islam attempts to distort the Section 1 inquiry to fit his specific allegations in this case. First, he claims the Section 1 exemption applies because, in his view, "he is a transportation worker engaged in interstate commerce." Compl. ¶ 23. To support that assertion, Mr. Islam alleges that while driving for the Lyft Platform, he "typically crossed state lines in the course of his work on a weekly basis." *Id.* ¶ 31. But whether Mr. Islam himself crossed state lines is a red herring. "The relevant inquiry is not whether an individual driver has crossed state lines, but whether the *class* of drivers crosses state lines." *Capriole*, 2020 WL 2563276, at *7. Indeed, his "personal exploits are relevant only to the extent that they indicate the activities performed by the overall class." *Rogers*, 2020 WL 1684151, at *5. And in fact, as explained below, the activities performed by the overall class of rideshare drivers are intensely local.

Next, Mr. Islam alleges that "*New York City* Lyft drivers are transportation workers engaged in interstate commerce" and thus fall within the Section 1 exemption. Compl. ¶ 105

12

(emphasis added).  Once again, this appears to be an attempt to limit the relevant "class of workers" to the narrow, geographically-circumscribed group of drivers that Mr. Islam seeks to represent.

That attempt misses the mark, because the relevant "class of workers" for purposes of Section 1 is all rideshare drivers within the United States—or, at a minimum, all of the drivers using the Lyft Platform within the United States.  *See*, *e.g.*, *Wallace v. Grubhub Holdings Inc.*, 2019 WL 1399986, at *4 (N.D. Ill. Mar. 28, 2019) (concluding that "Grubhub drivers" as a whole "do not belong to a class of workers engaged in interstate commerce"), *appeal pending*, No. 19-1564 (7th Cir.).  After all, drivers using the Lyft Platform nationwide offer rides pursuant to the same Terms of Service—although, in keeping with the local nature of rideshare transportation, different additional terms apply in different cities due to market conditions and local regulation.  And just as Section 1 uses the terms "seamen" and "railroad workers" at a high level of generality, without specifying a certain type of maritime or railroad worker or a specific company for which the worker performs work, the residual phrase "other class of workers" should be interpreted with the same level of generality.  After all, Congress would never enact a statute that read, for example: "seamen, railroad employees, truck drivers, and [say] New York City rideshare drivers."

Moreover, Mr. Islam's localized and case-specific interpretation of Section 1 would yield absurd results.  Under that interpretation, the applicability of FAA—a statute which embodies a "***national*** policy favoring arbitration" (*Concepcion*, 563 U.S. at 346)—would vary from case to case, driver to driver, state to state, or city to city.  A driver in Honolulu or Los Angeles—who is highly unlikely to cross a state line—would be subject to the FAA, while a driver in Washington, D.C. or Kansas City providing the same kind of local passenger transportation might not.

To avoid this patchwork approach, the relevant "class of workers" to which Mr. Islam belongs must be viewed as including all rideshare drivers nationwide—or at minimum all drivers using the Lyft Platform nationwide.

### 3. As a class, rideshare drivers provide predominantly local transportation services and are therefore not "engaged in foreign or interstate commerce."

Rideshare drivers like Mr. Islam are not "engaged in" interstate commerce as that term is used in Section 1. Rather, they provide local and overwhelmingly *intra*state transportation services. In a different case involving Lyft, Judge Chhabria concluded that, "as a class," rideshare drivers are "in the general business of giving people [local] rides, not in the particular business of offering interstate transportation services to passengers." *Rogers*, 2020 WL 1684151, at *5; *see also Capriole*, 2020 WL 2563276, at *9 ("Uber drivers do not perform an integral role in a chain of interstate transportation.").

#### a. Lyft's records demonstrate that rides on its platform are overwhelmingly local.

Lyft's records show that from November 21, 2016 to February 15, 2020, only an estimated 1.98% of rides using the Lyft Platform in the United States involved crossing state lines. Decl. of Ian Muir ¶ 5.[6] In other words, about **98%** of rides on Lyft's Platform do not involve crossing a state line. The services provided by rideshare drivers on other platforms appear to be similarly local in nature. For example, in *Capriole*, Uber showed that "only 2.5%" of rides on its platform nationwide cross state lines. 2020 WL 2563276, at *7. Although that percentage is slightly greater than the number submitted by Lyft, the court still concluded that drivers using Uber's platform are not "'engaged in interstate commerce' within the meaning of [Section 1]." *Id.* at *9.

#### b. The nature and regulation of Lyft's Platform underscore that drivers provide local transportation services.

The nature of the Lyft Platform confirms that drivers using that platform provide their transportation services locally, and only rarely cross state lines. Since its inception, Lyft has

---

[6]    The percentage of interstate rides has not materially changed in recent years. From February 15, 2019 to February 15, 2020, for example, the percentage of rides that crossed state lines is 2.05%—a difference of *less than one tenth of one percentage point*. Muir Decl. ¶ 6.

extended its platform on a city-by-city basis.[7]  Regulation of drivers' use of the Lyft Platform also occurs at the state and local level.  Most states, and some cities, regulate "Transportation Network Companies" ("TNCs") in some form, creating a patchwork of state and municipal requirements that Lyft and drivers using the Lyft Platform must follow.[8]  Consistent with those state-by-state requirements, drivers using the Lyft Platform are "only approved to drive in one coverage area" and are expected to meet the "specific requirements" of that area.[9]  These city-specific regulations underscore the fact that drivers are subject to specific state and local requirements, consistent with the local character of rideshare transportation.

The complaint alleges that drivers who are approved to drive in New York City are still permitted to make trips to other states.  *See* Compl. ¶¶ 37-49.  But the relevant "class of workers" cannot be localized to New York City in that way.  *See* pages 12-13, *supra*.  The *Rogers* court rejected this precise argument:  "Although we can safely assume that ***some*** drivers (especially those who live near state borders) regularly transport passengers across state lines," the drivers as a class are "in the general business of giving people rides, not the particular business of offering interstate transportation to passengers."  2020 WL 1684151, at *6 (emphasis added).  "Interstate trips that occur by happenstance of geography do not alter the intrastate transportation function performed by the class of workers."  *Id.*; *cf. Hill v. Rent-A-Ctr., Inc.*, 398 F.3d 1286, 1289-90 (11th Cir. 2005) (holding that Section 1 does not apply to "incidental" interstate movement, such as "the

---

[7]      *See, e.g.*, "Lyft Kicks Off Massive Expansion, Launching 40 Cities," Lyft Blog, https://blog.lyft.com/posts/lyft-launches (Jan. 26, 2017); *see also* https://www.lyft.com/rider/cities (last accessed on July 31, 2020) (listing cities Lyft operates in).

[8]      *See, e.g.*, Tex. A&M Transp. Inst., *Transportation Network Company (TNC) Legislation*, https://policy.tti.tamu.edu/technology/tnc-legislation/ (last accessed on July 31, 2020) ("[a]s of June 2017, 48 states and [D.C.] have passed some sort of TNC legislation" and "TNC regulation is also being introduced at the city level in some states").

[9]      Lyft Help Center, *Coverage Areas*, https://help.lyft.com/hc/en-us/articles/115012927607-Coverage-Areas (last accessed on July 31, 2020); *see also* Lyft Help Center, *State and City Driver Info*, https://help.lyft.com/hc/en-us/sections/115003494688 (last accessed on July 31, 2020) (linking the specific requirements for each coverage area).

interstate 'transportation' activities of . . . a pizza delivery person who delivered pizza across a state line to a customer in a neighboring town").

> c.    Local trips to or from airports and train stations do not mean that the relevant "class of workers" is "engaged in" interstate commerce for purposes of Section 1.

The fact that drivers using Lyft's Platform may sometimes "pick up and drop off people at airports and train stations" does not "mean that they are, as a class, 'engaged in' interstate commerce." *Rogers*, 2020 WL 1684151, at *6. Even under the much broader reach of the Sherman Act, the Supreme Court has held that when local taxi cabs transport passengers between their homes and a railroad station "in the normal course of their independent local service, that service is not an integral part of interstate transportation." *See United States v. Yellow Cab Co.*, 332 U.S. 218, 232 (1947), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)). In *Yellow Cab*, the Court explained that "the common understanding is that a traveler intending to make an interstate rail journey begins his interstate movement when he boards the train at the station and that his journey ends when he disembarks at the station in the city of destination." *Id.* at 231. "What happens prior to or subsequent to that rail journey," the Court continued, "is not a constituent part of the interstate movement." *Id.* at 232. Instead, "[t]o the taxicab driver, it is just another local fare." *Id.*; *see also Rogers*, 2020 WL 1684151, at *6 (noting that the "focus" of drivers using Lyft's Platform is not "transporting people to and from airports," because passengers can request rides "from pretty much anywhere to pretty much anywhere"); *cf. Vargas v. Delivery Outsourcing, LLC*, 2016 WL 946112, at *4 (N.D. Cal. Mar. 14, 2016) (holding that a driver who delivered luggage from airports to intrastate destinations was not engaged in interstate commerce, even when the luggage had arrived from out-of-state).

Finally, and relatedly, it is instructive that Section 1 does not apply to other forms of predominantly local passenger transportation. For example, it is beyond dispute that taxi cabs were in use in the decades prior to the FAA's enactment in 1925. *See, e.g.*, *Aurora Taxi Co. v.*

16

*Yellow Cab Mfg. Co.*, 229 Ill. App. 641 (Ill. Ct. App. 1923); *The Taxicab Cases*, 143 N.Y.S. 279 (N.Y. Sup. Ct., New York Cnty. 1913); *Stewart Taxi Serv. Co. v. Getz*, 84 A. 338 (Md. 1912). Yet there was no suggestion at the time of the FAA's enactment—or since—that Section 1 exempted taxi drivers from the FAA's coverage. Indeed, over two decades prior to the FAA the Supreme Court held that an intrastate cab service operated by a railroad to carry passengers to and from a ferry was not interstate commerce immune from state taxation, because it was not transportation "between the states." *New York ex rel. Pennsylvania Railroad v. Knight*, 192 U.S. 21, 27 (1904).

Although there are meaningful differences between taxicab drivers and rideshare drivers, there is no doubt that both types of workers focus on the local transportation of passengers. Had Congress intended in 1925 to treat predominantly local passenger transportation activity in the same manner as railroad or maritime work, it surely would have found a more direct way of doing so than Section 1's residual clause. After all, Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

> d.   *Cunningham* and *Waithaka* *do not support application of the Section 1 exemption here*

In contrast to the nearly-uniform set of cases addressing drivers using the Lyft and Uber platforms, one recent decision by a district court in Massachusetts held that the plaintiffs in that case fell within the Section 1 exemption because they drove passengers to Logan International Airport in Boston, "enabling their passengers to leave or enter Massachusetts." *Cunningham v. Lyft, Inc.*, 2020 WL 1503220, at *7 (D. Mass. Mar. 27, 2020), appeals pending, Nos. 20-1379, 20-1544, 20-1549, 20-1567 (1st Cir.). Mr. Islam will doubtless rely on *Cunningham* in his efforts to resist arbitration. But that reliance would be misplaced, because the court in *Cunningham* committed at least three fundamental errors in its Section 1 analysis—which explains why the court in *Capriole* recently sided with the decision in *Rogers* and rejected the approach in *Cunningham*. *See Capriole*, 2020 WL 2563276, at *9.

17

First, the *Cunningham* court did not attempt to define the relevant "class of workers" or to look at their activity as a whole. Instead, the court focused on the activity of the specific plaintiff, which is flatly contrary to the statutory text, as *Rogers* and *Capriole* held.

Second, *Cunningham*'s Section 1 analysis contradicts the Supreme Court's reasoning in *Yellow Cab* that occasional airport trips do not render a local transportation provider an integral part of interstate commerce. Tellingly, *Cunningham* does not even mention *Yellow Cab*, unlike the majority of courts that have concluded that rideshare drivers are not, as a class, engaged in interstate commerce for Section 1 purposes. *See Rogers*, 2020 WL 1684151, at *6-7; *Capriole*, 2020 WL 2563276, at *8 (both citing *Yellow Cab*).

Third, the *Cunningham* court cited *Palcko v. Airborne Express, Inc.,* 372 F.3d 588 (3d Cir. 2004) for the proposition that "[a] worker can be engaged in interstate commerce even if he doesn't personally cross a state border." 2020 WL 1503220, at *6. But *Palcko* addressed a very different question from the one presented in *Cunningham* and in this case. It involved whether a plaintiff who was a "direct supervisor of . . . drivers that transported packages" for a "company that engages in intrastate, interstate, and international shipping" was subject to the Section 1 exemption by virtue of overseeing the "truck drivers" who transported the goods. 372 F.3d at 593. By contrast, rideshare drivers who, as a class, are not engaged in interstate commerce are not supervising or managing other individuals who cross state lines. *See Heller*, 2020 WL 413243, at *7 (distinguishing *Palcko* as "inapposite" for that reason); *Grice*, 2020 WL 497487, at *7 (same).

Mr. Islam is also likely to point to the First Circuit's recent decision that the Section 1 exemption applies to those classes of workers who transport goods "within the flow of interstate commerce, not simply those who physically cross state lines in the course of their work." *Waithaka v. Amazon.com, Inc.*, --- F. 3d ----, 2020 WL 4034997, at *1 (1st Cir. July 17, 2020). But *Waithaka* offers Mr. Islam no assistance either.

To begin, *Waithaka* is readily distinguishable. Even if the First Circuit's "flow of interstate

18

commerce" theory were correct, it would not support the conclusion that rideshare drivers as a class are engaged in interstate commerce. Unlike the Amazon packages transported by the drivers at issue in *Waithaka* that routinely crossed state lines, the overwhelming majority of rides on Lyft's Platform do not involve crossing state lines. *See* page 14, *supra*. For that reason, Judge Chen distinguished similar decisions involving Amazon, "find[ing] those cases unavailing here because the packages at issue in those cases regularly traveled across state lines, whereas the passengers transported here rarely do." *Capriole*, 2020 WL 2563276, at *8 n.2. And unlike packages that are delivered across state lines as part of a single integrated trip, rides on Lyft's Platform that cross state lines occur only "by happenstance of geography" and "do not alter the intrastate transportation function performed by the class of workers." *Rogers*, 2020 WL 1684151, at *6.

In addition, as explained above, the phrase "engaged in foreign or interstate commerce" under the meaning of those terms at the time of the FAA's enactment requires transportation "across state lines (or international boundaries)." *Rogers*, 2020 WL 1684151, at *5; *see also Capriole*, 2020 WL 2563276, at *7. The First Circuit purported to find support for its broader interpretation in cases applying the Federal Employers' Liability Act of 1908 (FELA). *See Waithaka*, 2020 WL 4034997, at *6-8. But unlike the Section 1 exemption, which the Supreme Court has admonished requires a "narrow construction" (*Circuit City*, 532 U.S. at 118), FELA has long been "construed liberally." *Jamison v. Encarnacion*, 281 U.S. 635, 640 (1930); *see also, e.g., Shanks v. Del., Lackawanna & W. R.R.*, 239 U.S. 556, 558 (1916). Section 1 also uses the term "class of workers," while FELA is focused on whether a particular "person suffer[ed] injury while he is employed by [the particular] carrier in such commerce." *Illinois C. R. Co. v. Behrens*, 233 U.S. 473, 477 (1914) (quoting the 1908 version of FELA).

*    *    *

Given the intensely local nature of the Lyft Platform, rides on that platform "predominantly entail[] ***intrastate*** trips, an activity that undoubtedly ***affects*** interstate commerce but ***is not***

*interstate commerce* itself." *Rogers*, 2020 WL 1684151, at *6 (emphasis added). As a class, rideshare drivers like Mr. Islam do not perform work "similar in nature" to "seamen" and "railroad employees"—*i.e.*, work that routinely involves transportation across state lines as opposed to predominantly local transportation—and do not fall within the narrow Section 1 exemption.

> **4.    Rideshare drivers are not "engaged in foreign or interstate commerce" for the additional and independent reason that they primarily transport passengers rather than goods.**

Section 1 also does not apply to rideshare drivers like Mr. Islam for an entirely independent reason: those drivers transport people, not goods. Railroad and maritime workers differ from rideshare drivers in an additional respect—railroad and maritime workers as a class typically haul *goods* from state to state or country to country across long distances, while rideshare drivers ordinarily transport *passengers* across short distances. In *Circuit City*, the Supreme Court indicated that the Section 1 exemption is limited to "transportation workers . . . 'actually engaged in the movement *of goods* in interstate commerce." 532 U.S. at 112 (emphasis added). Consistent with that language in *Circuit City*, "[n]umerous courts have concluded that the *ejusdem generis* doctrine requires that the residual clause be limited only to those industries and workers dedicated to the movement of goods in interstate commerce, similar to seamen and railroad employees." *Heller*, 2020 WL 413243, at *7.

Many of these courts have thus held that rideshare drivers and other local transportation providers are not covered by the exemption because they are primarily responsible for the transportation of *passengers*. For example, one court explained that, "When driving with Uber, Plaintiff transported passengers to and fro, sometimes in interstate commerce, but he did not transport goods in interstate commerce. Such work places him outside 'any other class of workers engaged in . . . interstate commerce' described in the FAA's § 1 exclusions from mandatory arbitration." *Scaccia v. Uber Techs.*, 2019 WL 2476811, at *4 (S.D. Ohio June 13, 2019)); *see also, e.g.*, *Grice*, 2020 WL 497487 at *7; *Gray*, 2019 WL 1785094, at *2; *Pelayo v. Platinum*

*Limousine Servs., Inc.*, 2015 WL 9581801, at *12 n.6 (D. Haw. Dec. 30, 2015), *abrogated on other grounds by Campbell v. City of L.A.*, 903 F.3d 1090 (9th Cir. 2018); *Gadson v. SuperShuttle Int'l*, 2011 WL 1231311, at *5 (D. Md. Mar. 30, 2011), *vacated on other grounds by Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173 (4th Cir. 2013).

One court in this district reached the same conclusion, finding "the involvement of physical goods to be an indispensable element to being 'engaged in commerce in the same way that seamen and railroad workers are.'" *Kowalewski*, 590 F. Supp. 2d at 483-84. The court therefore held "that transporting passengers interstate as part of a car service is too far removed from the type of work engaged in by seamen and railroad workers" for the Section 1 exemption to apply." *Id.* at 484. And a state court in New York has followed *Kowalewski* and held that passenger airline pilots—who routinely transport passengers across state lines—are not exempt under Section 1 because they transport passengers rather than goods. *Jetblue Airways Corp. v. Stephenson,* 31 Misc. 3d 1241(A), 2010 WL 6781684, at *3 (N.Y. Sup. Ct., N.Y. Cty. 2010) (unpublished table decision), *aff'd*, 88 A.D.3d 567 (1st Dep't 2011).

Recently, the Third Circuit reached a contrary conclusion, holding that Section 1 applies to a class of workers that transports passengers across state lines—although declining to determine whether drivers on the Uber platform were part of such a class. *Singh*, 939 F.3d at 226. Some district courts have also taken that approach. *See, e.g.*, *Sienkaniec v. Uber Techs., Inc.*, 401 F. Supp. 3d 870, 871 (D. Minn. May 16, 2019).

However, those decisions are unpersuasive on this point. They fail to mention *Circuit City*'s recognition that Section 1 of the FAA reflects a "demonstrated concern with . . . the free flow of goods." *Circuit City*, 532 U.S. at 121. And while *Singh* points out that the Railway Labor Act, a statute enacted after the FAA that is mentioned in *Circuit City* as addressing dispute-resolution procedures for transportation workers, covered "sleeping car companies" (*i.e.*, "railway passenger cars," *Singh*, 939 F.3d at 221), that fact does not bear the significance that the *Singh*

court ascribed to it.  By noting that the inclusion of "railroad employees" in Section 1 was part and parcel of congressional concern with the flow of "goods," *Circuit City* recognized the reality that those employees were heavily devoted at the time to moving goods, not people.  *See Kowalewski*, 590 F. Supp. 2d at 484; *see also, e.g.*, *Heller*, 2020 WL 413243, at *8 (declining to follow *Singh* because "this Court is not convinced that the railroad and shipping industries were not considered by Congress as primarily involved in the transportation of goods"); *Grice*, 2020 WL 497487, at *8.  Moreover, any stoppage or other breakdown in railway passenger transport would have posed a direct threat to the transportation of goods, since passenger railway cars ran on the same lines as freight cars and sometimes transported freight in addition to passengers.  *See, e.g., Lake Shore & M. S. R. Co. v. State of Ohio*, 173 U.S. 285, 288 (1899); *Louisville & N.R. Co. v. E. Tennessee, V. & G. Ry. Co.*, 60 F. 993 (6th Cir. 1894).  The same cannot be said for the transportation provided by rideshare drivers, which has virtually nothing to do with the movement of goods.

**B.    Mr. Islam's Arbitration Agreement Is Otherwise Fully Enforceable As A Matter Of Federal Law.**

Apart from his Section 1 argument, Mr. Islam does not identify any other basis in his complaint for resisting enforcement of his arbitration agreement under the FAA, and indeed no such basis exists for the reasons discussed below.

**1.    Mr. Islam entered into a valid arbitration agreement.**

Mr. Islam entered into a binding agreement to arbitrate his disputes with Lyft.  This analysis is governed by "ordinary state-law principles that govern the formation of contracts."  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *accord Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 73-74 (2d Cir. 2017).  As the Supreme Court has underscored, states may not make arbitration agreements more difficult to create or enforce than other kinds of contracts: the FAA mandates that courts "place arbitration agreements on equal footing with all other contracts."  *Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1424 (2017).

To begin with, Mr. Islam's own complaint concedes that he agreed to Lyft's Terms of

Service.  Compl. ¶¶ 84-85 (stating that Mr. Islam "was a party to the February 2018 contract with Lyft" and now "is a party to the August 2019 contract").  That concession is for good reason: Courts in this district have enforced the arbitration provision in Lyft's Terms of Service Agreement where the plaintiff consented to the terms through the same process as Mr. Islam.  *See, e.g.*, *Camilo v. Lyft, Inc.*, 384 F. Supp. 3d 435, 439-40 (S.D.N.Y. 2019) ("[B]y clicking "I ACCEPT" upon being presented with the updated Terms of Service, Mr. Camilo accepted the terms of the updated contract and entered into an agreement with Lyft and its subsidiaries.").

Moreover, Mr. Islam asserts a breach of contract claim based on those agreements.  *Id.* ¶ 123.  Mr. Islam cannot and does not deny that he assented to the arbitration provision in the very contract under which he brings his claims.  *See also id.* ¶ 23 (stating that Mr. Islam "did not successfully opt out of Lyft's arbitration clause).

### 2.    Mr. Islam's claim is within the scope of his arbitration agreement.

Mr. Islam's breach-of-contract dispute over Lyft's policies falls well within the scope of his arbitration agreement.  To begin with, the plain language of the agreement requires arbitration of "ALL DISPUTES AND CLAIMS BETWEEN US," including disputes "arising out of or relating to" Lyft's Terms of Service, "the Lyft Platform," "your relationship with Lyft," or "payments made by you or any payments made or allegedly owed to you."  Shah Decl. Ex. 1 § 17(a).  The agreement also expressly includes claims for "breach of any kind of express or implied contract."  *Id.*  The Second Circuit has explained that a narrower clause—one that just covered claims "'arising out of or relating to'" the underlying contract containing the arbitration agreement—would be "the paradigm of a broad clause."  *Collins & Aikman Prods. Co. v. Bld. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995).  Mr. Islam's agreement with Lyft is even broader than that paradigmatically broad clause.  And, because Mr. Islam is asserting a breach of contract claim against Lyft, he cannot plausibly contend that his claims somehow fall outside the broad scope of the relevant contract's arbitration provision.  *See also Camilo*, 384 F. Supp. 3d at 440 (holding that

plaintiff's breach of contract claim fell within the scope of his arbitration agreement with Lyft).

## II.    MR. ISLAM'S ARBITRATION AGREEMENT IS ALSO ENFORCEABLE UNDER NEW YORK STATE LAW.

Even if Mr. Islam *did* belong to a class of workers engaged in interstate commerce—and thus his arbitration agreement with Lyft was not enforceable under the FAA—his arbitration agreement still would be enforceable under New York law.  Several courts in this district have enforced arbitration agreements under state law, even when they fall outside the ambit of the FAA. *See, e.g.*, *Espinosa v. SNAP Logistics Corp.*, 2018 WL 9563311, at *4 (S.D.N.Y. Apr. 3, 2018); *Burgos v. Northeast Logistics, Inc.*, 2017 WL 10187756, at *4 (E.D.N.Y. Mar. 30, 2017) ("Because New York arbitration law 'does not exempt transportation workers from arbitration,' the Arbitration Provision is enforceable"); *Valdes v. Swift Transp. Co., Inc.*, 292 F. Supp. 2d 524, 528 (S.D.N.Y. 2003) (holding that "any inapplicability of the FAA would not preclude enforcing the arbitration agreement under state law"); *O'Dean v. Tropicana Cruises Intern., Inc.*, 1999 WL 335381 (S.D.N.Y. May 25, 1999) ("The inapplicability of the FAA does not mean, however, that arbitration provisions in seaman's employment contracts are unenforceable, but only that the particular enforcement mechanisms of the FAA are not available.").

"[W]here the FAA does not apply, and the arbitration agreement contains no choice of law provision," courts should apply "the law of the jurisdiction having the 'greatest interest in the litigation.'"  *Valdes*, 292 F. Supp. 2d at 528.  Mr. Islam's arbitration agreement with Lyft "is governed by the Federal Arbitration Act."  Shah Decl. Ex. 1 ¶ 17.  But in the event that the FAA does not apply, it should be governed by New York law.[10]  Mr. Islam is a "New York City" driver

---

[10]    Although the majority of Lyft's Terms of Service Agreement is governed by California law, the choice-of-law provision expressly excludes Section 17, which includes the arbitration agreement.  *See* Shah Decl. Ex. 1 § 21 ("Except as provided in Section 17, this Agreement shall be governed by the laws of the State of California.").  Section 17 states that it is "governed by the Federal Arbitration Act."  *Id.* § 17.  Thus, in the event that the FAA is inapplicable, the arbitration agreement contains no choice-of-law clause and common-law rules for selecting the governing law apply.

24

using Lyft's Platform bringing this case on behalf of a putative class of other drivers in New York City challenging a change in Lyft's policies for New York City allegedly adopted in response to a change in the law that applies to New York City.  Compl. ¶¶ 10, 23, 63-68, 109.

"Since New York clearly has the greatest interest in the litigation, New York arbitration law applies."  *Diaz*, 167 F. Supp. 3d at 381.  And "New York law favors arbitration, 'interfering as little as possible with the freedom of consenting parties to submit disputes to arbitration."  *Id.* "New York arbitration law does not exempt transportation workers from arbitration. Thus, even assuming that the FAA does not apply," Mr. Islam is "compelled to arbitrate [his] claims."  *Id.* Specifically, Mr. Islam is not only required to arbitrate his claims, but to arbitrate them on an individual basis—as he agreed to do when he consented to Lyft's Terms of Service Agreement. "Under New York law, 'a contractual proscription against class actions . . . is neither unconscionable nor violative of public policy."  *Tsadilas v. Providian Nat'l Bank*, 13 A.D.3d 190, 191 (1st Dep't 2004) (quoting *Ranieri v. Bell Atl. Mobile*, 304 A.D.2d 353, 354 (1st Dep't 2003)); *accord Douglas v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 495 F.3d 1062, 1068 (9th Cir. 2007).

Mr. Islam's arbitration agreement is enforceable under New York law as well as the FAA.

## III.    THE CLAIMS AGAINST LYFT SHOULD BE STAYED PENDING ARBITRATION.

When, as in this case, the FAA governs an arbitration provision that covers a plaintiff's claims, Section 3 of the FAA directs the district court to compel arbitration and stay the proceedings.  *See* 9 U.S.C. § 3 (providing for a stay of court proceedings pending the resolution of arbitration); *see also, e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25 (1991); *Katz v. Cellco P'Ship*, 794 F.3d 341, 343 (2d Cir. 2015).  New York law similarly calls for a stay of litigation pending arbitration.  *See* NY CPLR § 7503(a); *Tsalidas*, 13 A.D.3d at 190.

## CONCLUSION

For the foregoing reasons, the Court should compel arbitration of Mr. Islam's claims against Lyft and stay the litigation of those claims pending the resolution of arbitration.

Respectfully submitted,

Dated:  July 31, 2020                          MAYER BROWN LLP


                                               */s/ Matthew D. Ingber*
                                               Matthew D. Ingber
                                               MAYER BROWN LLP
                                               1221 Avenue of the Americas
                                               New York, NY 10020
                                               Tel.:  (212) 506-2500
                                               Fax:  (212) 262-1910
                                               mingber@mayerbrown.com

                                               Archis A. Parasharami
                                               MAYER BROWN LLP
                                               1999 K Street N.W.
                                               Washington, D.C. 20006
                                               Tel.:  (202) 263-3328
                                               Fax:  (202) 263-5328
                                               aparasharami@mayerbrown.com

                                               *Attorneys for Defendant Lyft, Inc.*