UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 03/09/2021

| | |
|---|---|
| MD ISLAM, *on behalf of himself and those similarly situated*,<br><br>                     Plaintiff,<br><br>       v.<br><br>LYFT, INC.,<br><br>                     Defendant. | 20-CV-3004 (RA)<br><br>OPINION AND ORDER |

RONNIE ABRAMS, United States District Judge:

Plaintiff MD Islam, a New York City-based driver for the ridesharing company Lyft, brought this putative class action suit challenging Lyft's practice of logging its drivers off of the Lyft app for performing too few rides. *See* Dkt. 1 ("Compl."). Plaintiff alleges that this practice violates the contract between Lyft and its drivers, which "specifically provide[s] that drivers shall have no limitations on their ability of where and when to access the Lyft app." *Id*. ¶ 15. That same driver agreement, however, contains a clause requiring Plaintiff to arbitrate his disputes with Lyft on an individual basis. Lyft accordingly moves to compel Plaintiff to proceed to that arbitration, arguing that both the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, and New York law require the Court to enforce the arbitration clause according to its terms. *See* Dkts. 11–13.

Plaintiff opposes the motion on the ground that the FAA is inapplicable, as Section One of the FAA excludes from the Act's purview "contracts of employment of seamen, railroad employees, *or any other class of workers engaged in foreign or interstate commerce*." 9 U.S.C. § 1 (emphasis added). Plaintiff argues that as a driver for Lyft, he belongs to such a class of workers, in that Lyft drivers regularly ferry passengers across state lines and also transport

people on the local portions of their interstate journeys by taking them to and from airports, train stations, and other hubs of interstate travel. Plaintiff also argues that if the FAA is held not to apply, state law does not in this case furnish an alternate basis to compel arbitration. Plaintiff separately moves for discovery going to the interstate nature of Lyft drivers' work, *see* Dkt. 29, which Lyft opposes.

For the following reasons, the Court agrees with Plaintiff that, on the basis of information already in the record, he belongs to a class of workers engaged in interstate commerce, and therefore that the FAA does not apply to his contract. The Court finds, however, that state law provides an alternate basis to compel arbitration. Accordingly, Lyft's motion to compel arbitration and stay this litigation is granted, and Plaintiff's motion for discovery to aid in the Court's Section One analysis is denied as moot.

## BACKGROUND

Plaintiff filed this putative class-action lawsuit against Lyft in April 2020, alleging that Lyft has adopted an "unlawful practice, in violation of the driver agreement, of forcibly logging off Lyft drivers from the Lyft app if they perform fewer than 100, or 180 rides in a 30-day period." *See* Compl. at 1. The driver agreement, however, unmistakably contains an arbitration clause—"governed by the Federal Arbitration Act" and covering "all disputes and claims between" drivers and Lyft "arising out of or relating to" Lyft's terms of service, the Lyft Platform, or the driver's relationship with Lyft. *See* Dkt. 13-1 at 20–21. The agreement provides, in part, as follows:

17. DISPUTE RESOLUTION AND ARBITRATION AGREEMENT

(a) Agreement to Binding Arbitration Between You and Lyft

YOU AND LYFT MUTUALLY AGREE TO WAIVE OUR RESPECTIVE RIGHTS TO RESOLUTION OF DISPUTES IN A COURT OF LAW BY A JUDGE OR JURY AND AGREE TO RESOLVE ANY DISPUTE BY ARBITRATION, as set forth below. . . .

2

> ANY ARBITRATION UNDER THIS AGREEMENT WILL TAKE PLACE ON AN INDIVIDUAL BASIS; CLASS ARBITRATIONS AND CLASS ACTIONS ARE NOT PERMITTED. Except as expressly provided below, this Arbitration Agreement applies to all Claims . . . between you and Lyft. . . . Except as expressly provided below, ALL DISPUTES AND CLAIMS BETWEEN US . . . SHALL BE EXCLUSIVELY RESOLVED BY BINDING ARBITRATION SOLELY BETWEEN YOU AND LYFT.

*Id.* Plaintiff concedes that he did not opt out of this arbitration clause. *See* Compl. ¶¶ 23, 29, 105. He also does not dispute the facial validity of the arbitration clause, nor the fact that his breach-of-contract claim against Lyft falls within the scope of it. Plaintiff nonetheless argues that he cannot be compelled to arbitrate under the FAA, in that his contract falls under the residual category of 9 U.S.C. § 1, *i.e.*, that he is part of a "class of workers engaged in . . . interstate commerce." Before discussing the factual background bearing on whether Plaintiff is part of such a class of workers, the Court reviews the statutory framework in which this issue arises.

## I.      The FAA's Section One Exemption

Section Two of the FAA—the "primary substantive provision of the Act," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)—declares that an arbitration clause in any "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. This provision embodies a "liberal federal policy favoring arbitration," *Moses H. Cone*, 460 U.S. at 24, and it requires federal courts to "place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms." *AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (internal citations omitted). Section One of the Act, however, carves out an exemption: "Nothing" in the FAA "shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. This exception specifically enumerates two classes of exempt workers who cannot be compelled to arbitrate under the FAA – maritime and railroad employees – while including the "residual category" of classes of

workers engaged in foreign or interstate commerce. *See Wallace v. Grubhub Holdings*, Inc., 970 F.3d 798, 800 (7th Cir. 2020).

The leading Supreme Court case interpreting the residual category is *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105 (2001). The plaintiff in that case—an employee of a consumer electronics retailer—sought to avoid his contract's arbitration clause by arguing that Section One of the FAA precludes arbitration with respect to *all* contracts of employment. The Court rejected this view, holding that the residual category of Section One is confined to the employment contracts of "transportation workers." *Circuit City*, 532 U.S. at 109. To reach that conclusion, the Court applied the statutory canon of *ejusdem generis* to hold that the residual category should be construed as "embrac[ing] only objects similar in nature to those objects enumerated by the preceding specific words"—i.e., seamen and railroad workers. *Id*. at 114–115 (citation omitted). The Court further observed that the phrase "*engaged* in" interstate commerce sweeps less broadly than, for example, "*affecting*" commerce or "*involving*" commerce, such that the Section One exemption should be "afforded a narrow construction." *Id*. at 118. To fall into the residual category, then, a class of workers must be transportation workers who are "active[ly] employ[ed]" in interstate commerce. *Wallace*, 970 F.3d at 801 (quoting *Circuit City*, 532 U.S. at 116).[1] Put another way, as the Seventh Circuit did in *Wallace*, the relevant inquiry is whether the "interstate movement of goods [or people] is a central part of the class members' job description." *Wallace*, 970 F.3d at 801.

---

[1] As the Supreme Court has held, "the Section 1 exemption does not apply exclusively to contracts of 'employees,' but rather to 'agreements to perform work,' including those of independent contractors." *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 17 (1st Cir. 2020) (quoting *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 544 (2019)).

As multiple courts have made clear, whether an individual transportation worker is entitled to the Section One exemption depends not on whether she *personally* has engaged in interstate commerce, but "whether the *class* of workers to which the complaining worker belong[s] [is] engaged in interstate commerce." *Bacashihua v. U.S. Postal Service*, 859 F.2d 402, 405 (6th Cir. 1988) (emphasis added); *see also Capriole v. Uber Techs., Inc.*, 460 F. Supp. 3d 919, 929 (N.D. Cal. 2020). What this means is that "a member of the class qualifies for the exemption even if she does not personally engage in interstate commerce," and, at the same time, "someone whose occupation is not defined by its engagement in interstate commerce does not qualify for the exemption just because she occasionally performs that kind of work." *Wallace*, 970 F.3d at 800 (citing *Bacashihua*, 859 F.2d at 405). For example, a furniture sales account manager who sometimes delivers furniture across state lines is not entitled to the exemption, because he does not belong to a class of transportation industry workers actively engaged in the interstate movement of goods. *See, e.g., Hill v. Rent-a-Center*, 398 F.3d 1286, 1289–90 (11th Cir. 2005). But a truck driver for a company that regularly makes interstate trips falls within the exemption even if she herself only occasionally crosses state lines. *See, e.g., Int'l Brotherhood of Teamsters Local Union No. 50 v. Kienstra Precast, LLC*, 702 F.3d 954, 958 (7th Cir. 2012); *Smith v. Allstate Power Vac, Inc.*, No. 17-CV-7475 (NGS), 2020 WL 5086584, at *4 (E.D.N.Y. Aug. 26, 2020) (plaintiff truck driver qualified for the exemption even though her job for a company that transported waste across state lines was principally to extract the waste, whereas other colleagues were "typically responsible for driving the waste to the out-of-state disposal facility"). Because the analysis necessarily focuses on the activity of a *class* of workers, a "plaintiff['s] personal exploits are relevant only to the extent they indicate the activities performed by the overall class." *Rogers v. Lyft, Inc.*, 452 F. Supp. 3d 904, 915 (N.D. Cal. 2020).

In asking whether a class of workers is engaged in interstate commerce, some courts have examined not only the activities of the workers themselves—i.e., how frequently the workers themselves cross state lines—but also the "geographic footprint and nature of the business for which they work." *Waithaka v. Amazon.com, Inc.*, 966 F.3d 10, 22 (1st Cir. 2020); *Singh v. Uber Techs. Inc.*, 939 F.3d 210, 227-28 (3d Cir. 2019) (in determining whether a class of workers is exempt under Section One, courts may consider, *inter alia*, "information regarding the industry in which the class of workers is engaged"). For that reason, the Section One exemption has been found to cover "workers transporting goods or people *within the flow of interstate commerce*," not merely those who "physically cross state lines in the course of their work." *Waithaka*, 966 F.3d at 13 (emphasis added). For example, in *Waithaka*, the First Circuit held that Amazon contractors who pick up packages that have traveled across state lines to Amazon warehouses and then deliver them locally to their final destinations are, as a class of workers, engaged in interstate commerce even though the drivers do not themselves cross states lines, because they are "locally transporting goods on the last legs of interstate journeys." 966 F.3d at 13. *See also Rittman v. Amazon, Inc.*, 971 F.3d 904 (9th Cir. 2020), *cert. denied*, No. 20-622, 2021 WL 666403 (U.S. Feb. 22, 2021) (same).

The holdings in *Waithaka* and *Rittman* were informed by the fact that Amazon's business as a whole centrally involves the interstate transportation of goods. *See Waithaka*, 966 F.3d at 22 ("The nature of the business for which a class of workers perform their activities must inform" the Section One inquiry); *Rittman*, 971 F.3d at 915 (noting Amazon's description of itself as "one of the world's largest online retailers that works closely with freight and transport companies on a massive scale to ensure that every individual shipment gets where it needs to go"). In contrast to *Waithaka* and *Rittman*, which found local delivery drivers to be a part of the flow or stream of interstate commerce, the Seventh Circuit held in *Wallace* that GrubHub food

delivery drivers are not a class of workers engaged in interstate commerce merely because they "carry goods that have moved across state and even national lines." *Wallace*, 970 F.3d at 802. Writing for the panel, then-Judge Barrett found this to be insufficient, holding that "to fall within the exemption, the workers must be connected not simply to the goods, but to the act of moving those goods across state or national borders." *Id*.

This is not the first case to present the question of whether rideshare drivers for Lyft or Uber are part of a class of workers engaged in interstate commerce. Although the Court engages with these cases more fully below, it mentions several of them here to note them as part of the statutory backdrop to this case. Two recent appellate decisions are directly on point. In *In re Grice*, 974 F.3d 950 (9th Cir. 2020), the Ninth Circuit denied a mandamus petition seeking reversal of the district court's holding that Uber drivers do not qualify for the Section One exemption. The panel rejected the petitioner's argument that he was engaged in interstate commerce because he regularly drove passengers to and from airports in Alabama. *Id*. at 954.[2] In *Singh*, the Third Circuit vacated the district court's determination that Uber drivers could not fall within the Section One exemption, which was based on the view that Section One "only extends to transportation workers who transport *goods*, not those who transport *passengers*." 939 F.3d at 214 (emphasis added). Having rejected the goods/passengers distinction, the Third Circuit remanded for the district court to take limited discovery and to determine in the first instance whether Uber drivers are a class of workers engaged in interstate commerce.

---

[2] It bears noting that the Ninth Circuit was applying the highly deferential standard of review for mandamus petitions, and acknowledged that the issue was not necessarily clear cut. *See Grice*, 974 F.3d at 958-959 (citation omitted) ("[E]ven accepting that there are some tensions between the district court's ruling and recent circuit cases addressing the scope and application of the FAA's § 1 exemption clause, that tension is not enough to render the district court's decision clear error as a matter of law, the necessary condition for granting a writ of mandamus.").

A number of district courts have also recently faced this question. In *Rogers*, Judge Chhabria in the Northern District of California concluded that "Lyft drivers, as a class, are not engaged in interstate commerce" because "[t]heir work predominantly entails intrastate trips." 452 F. Supp. 3d at 916. The court found that Lyft's interstate trips are the "incidental" result of the fact that some drivers live near state borders, and that Lyft drivers' ferrying of passengers to airports and train stations does not mean that they are "engaged in interstate commerce" because Lyft is not "focus[ed] [on] the service of transporting people to and from airports." *Id.* at 916. In *Cunningham v. Lyft, Inc.*, 450 F. Supp. 3d 37 (D. Mass. 2020), Judge Talwani came out the other way, relying on the plaintiffs' frequent trips to Logan International Airport in Boston to find that they were "part of the chain of interstate commerce" in that they "enabl[e] their passengers to leave or enter Massachusetts." *Id.* at 46. In *Capriole*, Judge Chen in the Northern District of California found that Uber drivers in Massachusetts do not fall within Section One's residual category because "interstate rides given by Uber drivers in Massachusetts . . . are rare" and because "Uber drivers do not perform an integral role in a chain of interstate transportation." 460 F. Supp. 3d at 932.

## II.    Factual Background

Against that backdrop, the Court turns to the factual record of this case.[3] The Court notes at the outset that the parties disagree about what facts are relevant, in particular because they dispute the scope of the relevant "class of workers" to which Plaintiff belongs. Plaintiff argues that the appropriate class for purposes of the Section One analysis consists of New York City

---

[3] The Court has relied primarily on the facts as alleged in Plaintiff's complaint and as attested to in the parties' declarations submitted alongside their motion papers. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002)) ("In deciding motions to compel [arbitration], courts . . . 'consider all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with ... affidavits.'").

Lyft drivers, *see* Dkt. 34 at 6, whereas Lyft argues that the relevant class is all rideshare drivers

nationwide, or at least all Lyft drivers in the United States, *see* Dkt. 12, Lyft, Inc.'s

Memorandum of Law in Support of Motion to Compel Arbitration ("Lyft Mem.") at 2.

Accordingly, Plaintiff emphasizes facts about the frequency with which he and by proxy other

New York City-based Lyft drivers cross state lines. Lyft dismisses those facts as inapposite,

focusing instead on national data. Plaintiff also emphasizes facts about the role rideshare drivers

play in transporting passengers "within the flow of interstate commerce, not simply [by]

physically cross[ing] state lines." *Waithaka*, 966 F.3d at 13. These include facts about the

frequency with which rideshare drivers for Lyft and Uber ferry passengers to airports, train

stations, and other such travel hubs. Lyft argues, by contrast, that such a "flow of interstate

commerce" theory cannot be plausibly applied to rideshare drivers and indeed that such an

application is foreclosed by Supreme Court precedent. *See* Dkt. 31 at 7 (citing *United States v.*

*Yellow Cab Co.*, 332 U.S. 218 (1947)). The Court addresses these disputes below in greater

detail, for now noting all facts that are arguably relevant to the inquiry.

Lyft is "one of the largest and fastest-growing transportation networks in the United

States." Dkt. 28-9 at 6 (Lyft's Form 10-K Report). The company describes itself as "a mobile-

based ridesharing marketplace platform . . . that enables people to who seek rides to certain

destinations to be matched with people willing to drive to or through those destinations." Dkt.

13, Declaration of Neil Shah, ¶ 3. Those connections are facilitated via the Lyft mobile app. *Id*.

According to Lyft's business records, between approximately 1.97 and 1.98 percent of

completed rides on the Lyft platform in the United States involved crossing state lines during the

period from November 2016 to February 2020, and approximately 2.05 percent of rides involved

crossing state lines in the period from February 2019 to February 2020. Dkt. 16, Declaration of

Ian Muir, ¶¶ 5–6. The nationwide share of interstate rides for Uber—a similar company and

mobile platform—is roughly comparable. *See Capriole*, 460 F. Supp. 3d at 929 ("Uber has provided evidence that only 2.5% of all trips . . . in the United States between 2015 and 2019 . . . started and ended in different states.").

Lyft's policies "contemplate the regular performance of interstate transportation work by its drivers." Compl. ¶ 37. Nationally, Lyft drivers are generally "approved to drive" and pick up passengers "in one coverage area," which is typically defined at a city or state level. Dkt. 24-2 at 3. Lyft's services are also regulated on the state and local level, with different rules applying to Lyft drivers in different coverage areas. *See* Lyft Mem. at 15. At the same time, passengers "can be dropped off up to 100 miles outside" of a given coverage area, without respect to state boundaries. Dkt. 24-2 at 3. In fact, drivers are strongly incentivized to perform such trips when requested by a passenger. "Once a driver receives a dispatch, Lyft specifies the pick-up location, but withholds the drop off location until the passenger has entered the vehicle." Compl. ¶ 45. Although a driver who prefers to stay closer to home may cancel the trip at that point, he does so at risk of jeopardizing his access to the Lyft platform. *See* Dkt. 24-3 at 4 (Lyft's online driver tutorial informing drivers that "[i]f you cancel 15 or more of your last 100 accepted rides, . . . your driver account could be at risk."). As a result, Plaintiff alleges, "no driver [has] the option to exclude performing interstate trips, without risking further exposure to deactivation." Compl. ¶ 47.

Plaintiff himself has been a Lyft driver based in New York City since 2014. He estimates that he "typically crossed state lines in the course of his work [as a Lyft driver] on a weekly basis." Compl. ¶ 31. He further estimates that interstate trips account for four to five percent of his total trips. Dkt. 27 ("Islam Decl.") ¶ 5. Those interstate trips are also "significantly longer and more expensive than [his] average trips," such that they make up around 20 percent of his total earnings from Lyft. *Id*. ¶ 6. Lyft services in the New York City coverage area expressly

contemplate rides across state lines, by providing for a $20 surcharge on all trips between New York and New Jersey and by advertising service from New York City to Newark International Airport. Compl. ¶ 37-42; *see also* Dkt 24-1 at 9.

Finally, there is some information in this record and in public records about the extent to which rideshare drivers regularly complete trips to airports and train stations. Although these trips may not cross state lines, they often constitute the initial or final legs of a passenger's interstate journey. Uber reports that it "generates a significant percentage of [its] gross bookings from trips . . . to and from airports." Dkt. 24-10 at 38. *See also Capriole*, 460 F. Supp. 3d at 930 ("Uber has provided data indicating that 10.1% of all Uber trips taken in the United States in 2019 began or ended at an airport."). Plaintiff himself approximates that trips to airports, train stations, and bus stations constitute about 25 percent of his total trips for Lyft. Islam Decl. ¶¶ 8– 10. There is some additional evidence that Lyft has "worked to integrate its transportation services with Delta Airlines," allowing passengers to book Lyft rides through the Delta app and to pay for the rides using Delta SkyMiles. Dkt. 34 at 9. Plaintiff's cross motion for discovery seeks to supplement this factual record with information from Lyft regarding "the portion of the putative [class's] work, by hails or sales revenue, that is derived from trips to airports and other interstate transportation hubs." Dkt. 29 at 1. As noted below, Lyft argues that these facts are irrelevant to the question of whether Lyft drivers are engaged in interstate commerce, asserting that the "putative class" of New York City-based Lyft drivers is not the same as the "class of workers" to which Plaintiff belongs under 9 U.S.C. § 1.

## III.    Procedural History

Plaintiff filed the operative class-action complaint on April 13, 2020. *See* Dkt. 1. On July 31, 2020, Lyft moved to compel arbitration. *See* Dkt. 11. Lyft argues that rideshare drivers, as a class, provide predominantly local transportation services; that providing trips to airports and

train stations does not constitute being "engaged in" interstate commerce; that the Section One exemption applies only to those who primarily transport goods rather than passengers; and that Plaintiff's arbitration agreement is separately enforceable under New York state law. *See generally* Lyft Mem. In September 2020, Plaintiff opposed the motion to compel and separately filed a cross motion for discovery relating to the interstate nature of Lyft's business. *See* Dkts. 26, 29. Plaintiff argues that Lyft drivers—particularly those based in New York City—are transportation workers engaged in interstate commerce in that they routinely cross state lines (and are expected to do so) and also in that they provide transportation services within the flow of interstate commerce. Plaintiff also argues that, because the arbitration clause is "governed by" the FAA, he cannot be compelled to arbitrate under state law if the FAA is deemed not to apply. *See* Dkt. 26, Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Compel Arbitration ("Pl. Mem."). The Court held oral argument on the motions on February 3, 2021. *See* Dkt. 38 (transcript).

## LEGAL STANDARD

"Courts deciding motions to compel [arbitration] apply a standard similar to that applicable for a motion for summary judgment." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (internal quotation marks omitted). Under the summary judgment standard, the court considers "all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . affidavits, and draws all reasonable inferences in favor of the non-moving party." *Id.* (internal quotation marks and citations omitted). "[W]here the undisputed facts in the record require the matter of arbitrability to be decided against one side or the other as a matter of law, [courts] may rule on the basis of that legal issue and avoid the need for further court proceedings." *Id.* (internal quotation marks omitted).

**DISCUSSION**

**I.      Plaintiff Falls Within the "Residual Category" of 9 U.S.C. § 1**

For the reasons that follow, the Court concludes that rideshare drivers in the United

States are a "class of workers engaged in . . . interstate commerce," 9 U.S.C. § 1, such that the

Federal Arbitration Act cannot be the basis to compel Plaintiff to arbitrate his claims.

**A.  The Scope of the Class**

As noted, the relevant inquiry under Section One is not whether Plaintiff *himself* is

engaged in interstate commerce, but whether he belongs to a "class of workers" that is. *See*

*Singh*, 939 F.3d at 227 ("[T]he inquiry regarding § 1's residual clause asks a court to look to

classes of workers rather than particular workers."). To make that determination, then, it is

necessary to decide at what level of generality the relevant class should be defined. Plaintiff

argues that the relevant "class" for the Section One analysis is the same as the putative "class" on

behalf of which he brings this action, i.e., New York City-based Lyft drivers. He notes that the

merits of his breach-of-contract claim concern a policy of Lyft's that was "only applied in

NYC," such that "the class of workers who would be at issue are only NYC Lyft drivers." Pl.

Mem. at 19. Lyft, by contrast, argues that the relevant class is all rideshare drivers (or at least all

Lyft drivers) in the United States. *See* Lyft Mem. at 12–13. This dispute is arguably material in

that a New York City-based rideshare driver is indisputably more likely to cross state boundaries

than one based in Honolulu (or, for that matter, San Antonio). In this case, whereas Plaintiff

maintains that four-to-five percent of his rides cross state lines (a share he suggests is likely to

resemble that of other drivers based in New York City), Lyft has established that only around

two percent of all national rides begin and end in a different state.

The case law is inconsistent on the question of how to define a class for Section One

analysis. Some courts have considered the relevant class at a high level of generality, without

regard to the particular circumstances or geographical location of the plaintiffs. *See, e.g., Rogers*, 452 F. Supp. 3d at 916 ("Lyft drivers, as a class, are not engaged in interstate commerce."); *Wallace*, 970 F.3d at 799 (framing the relevant question as "whether food delivery drivers for Grubhub are exempt from the" FAA); *see also Sienkaniec v. Uber Techs., Inc.*, 401 F. Supp. 3d 870, 872 (D. Minn. 2019) ("There is a strong argument that the 'class of workers' to which Sienkaniec belongs is 'all Uber drivers in the United States.' After all, Uber drivers perform the same job for the same company pursuant to the same agreement."). Other courts have framed the class more narrowly. *See, e.g., Capriole*, 460 F. Supp. 3d at 932 (emphasizing, in support of its conclusion that plaintiff was not exempt under Section One, that "interstate rides given by Uber drivers in Massachusetts [are] not only incidental – they are rare"); *Cunningham*, 450 F.Supp 3d at 47 (emphasizing that plaintiffs were "part of the chain of interstate commerce, enabling their passengers to leave or enter Massachusetts"); *Kienstra*, 702 F.3d at 957 (focusing on trips taken from Illinois to Missouri by the employees of a single trucking company).

The Court finds Lyft's arguments to be more persuasive. The FAA embodies a "*national* policy favoring arbitration," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) (emphasis added), and it would be illogical if Lyft drivers performing the same work for the same company in different cities were to have completely different rights and obligations under the FAA merely because of a "happenstance of geography," *Rogers*, 452 F. Supp. 3d at 916. Lyft also notes that the statute exempts from the FAA "seamen" and "railroad employees" at a high level of generality, irrespective of their locations or their specific employers, and therefore that any other "class of workers" should be defined in an equally broad fashion. Plaintiff does not provide any compelling reasons to conclude that a "class" for the purposes of a class-action lawsuit is necessarily the same as a "class of workers" under Section One. The Court will accordingly assume for purposes of deciding this motion that the relevant class of workers to

which Plaintiff belongs is the nationwide class of rideshare drivers for national companies that operate in a manner similar to Lyft and Uber.

**B.   The Nationwide Class to Which Plaintiff Belongs is "Engaged in . . . Interstate Commerce"**

Thus framed, the question the Court must decide is whether the nationwide class of rideshare drivers for companies like Lyft and Uber—who cross state lines on between two and three percent of all their trips, *see* Muir Decl. ¶¶ 5–6; *Capriole*, 460 F. Supp. 3d at 929—is "engaged in . . . interstate commerce" under 9 U.S.C. § 1. The Court concludes that it is, while recognizing that this is a close question that has divided courts to date.

The Court's analysis begins with the text of the statute. *See Woods v. Empire Health Choice, Inc.,* 574 F.3d 92, 98 (2d Cir. 2009). Section One provides that the FAA shall not apply to "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." As the Supreme Court has noted, the use of the term "engaged in" plainly has a limiting effect on the sweep of the exemption. Whereas the FAA applies generally to arbitration clauses contained in contracts "evidencing a transaction *involving* commerce," 9 U.S.C. § 2 (emphasis added), the Section One exemption carves out a more limited exemption for employment contracts of those "*engaged* in" interstate and foreign commerce. "The plain meaning of the words 'engaged in commerce' is narrower than the more open-ended formulations 'affecting commerce' and 'involving commerce.'" *Circuit City*, 532 U.S. at 118. Lyft further observes that dictionaries from the time of the enactment of the FAA define being "engaged" in something as being "occupied" by or "employed" at it. *See* Lyft Mem. at 10 (citing Webster's New International Dictionary (1st ed. 1909); Black's Law Dictionary 425 (2d ed. 1910)).

For those reasons, the residual category of Section One has been given "a narrow construction," limited in its application to transportation workers. *Circuit City*, 532 U.S. at 118–119. Courts have further clarified that to be "engaged in" interstate commerce means to perform work that at its core involves movement across state lines. *See Singh*, 939 F.3d at 220 (citation omitted) ("[T]he residual clause of [Section One] only includes those other classes of workers who are *actually engaged in the movement* of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it."); *Wallace*, 970 F.3d at 801 (Section One applies only where "interstate movement . . . is a central part of the class members' job description").[4]

But just how much interstate movement is enough? The text of the statute does not resolve that question. As the Seventh Circuit noted in *Kienstra*, "there is no basis in the text of § 1 for drawing a line between workers who do a lot of interstate transportation work and those who cross state lines only rarely; both sorts of worker are 'engaged in foreign or interstate commerce.'" 702 F.3d at 958. Nor does the Court see any basis to read into Section One the words "*predominantly* engaged in" or "*primarily* engaged in" interstate commerce, even accepting Lyft's definitions that being "engaged in" an activity means being occupied by or employed at that activity. By way of illustration, any federal district judge would answer in the affirmative if asked whether or not she was "engaged in" conducting criminal trials, notwithstanding that most federal judges' dockets consist primarily of civil actions and the majority of criminal prosecutions are resolved by a guilty plea. Overseeing criminal trials is unquestionably a "central part of [a federal district judge's] job description," *Wallace*, 970 F.3d

---

[4] To be sure, as the First Circuit held in *Waithaka*, workers need not themselves cross state lines to be "engaged in" the interstate movement of goods or people if they "transport[] goods or people within the flow of interstate commerce." 966 F.3d at 26.

at 801, even if it is not something that she does every day or even every month. The Court does

not doubt that, under Section One, a class of transportation workers must perform more than a *de*

*minimis* amount of interstate transportation to be found to be "engaged in . . . interstate

commerce," and that that work must not be "incidental" in nature. But at the same time, the

Court rejects the notion that crossing state lines must be the primary, daily function of a class of

transportation workers in order to bring that class within the ambit of the Section One exemption.

In this case, Lyft argues that whatever the threshold may be, the fact that only two

percent of Lyft rides cross state lines demonstrates that drivers are not actively engaged in

interstate commerce. Lyft argues that its "drivers are 'in the general business of giving people

[local] rides, not the particular business of offering interstate transportation services to

passengers.'" Lyft Mem. at 12 (quoting *Rogers*, 452 F. Supp. 3d at 916). Lyft acknowledges that

some drivers who live near state borders regularly cross state lines, but cites *Rogers* for the

proposition that "[i]nterstate trips that occur *by happenstance of geography* do not alter the

intrastate transportation function performed by the *class* of workers." *Rogers*, 452 F. Supp. 3d at

916 (emphasis added). Lyft also argues that the local nature of rideshare transportation is

evidenced by the fact that rideshare services are regulated on the city and state levels, with

drivers in each city following a different set of local rules.

The Court is not persuaded by these arguments. First, the mere fact that only two to three

percent of Lyft and Uber rides cross state lines does not render those trips "incidental."

Ridesharing platforms provide hundreds of millions of rides in the United States each year. *See*

Pl. Mem. at 12–13 (noting that Uber's total number of U.S. trips in 2019 was 1.5 billion, and that

Lyft's total number of U.S. trips in 2018 was 619 million). Two to three percent of those trips

adds up to tens of millions of interstate rides in the United States each year. The Court also sees

no reason to conclude, as Judge Chhabria did in *Rogers*, that these trips cross state lines only "by

happenstance of geography." 452 F. Supp. 3d at 916. That claim presupposes that Lyft and Uber rides are necessarily short, local trips, some percentage of which will cross state lines when they are initiated by passengers living near state boundaries—for example, when a resident of Philadelphia, PA takes a short Lyft ride to meet a friend for lunch across the Delaware River in Camden, NJ. The interstate nature of a trip like that, or of a trip from Manhattan to Newark Liberty International Airport, might indeed be considered the incidental byproduct of geography. But Lyft's platform is expressly designed to enable longer, non-local rides by allowing passengers to be dropped off up to 100 miles outside of the coverage area where the ride begins. Dkt. 24-2 at 3. Plaintiff, for his part, estimates that his interstate trips to New Jersey and Connecticut "were significantly longer and more expensive than [his] average trips"— accounting for twenty percent of his total revenue from Lyft—not merely short local rides that just so happened to cross state lines. Islam Decl. ¶ 4, 14.[5]

From the perspective of an individual driver, these interstate trips are a regular component of his or her day-to-day work. Supposing that one in fifty of an active driver's trips cross state lines, an individual driver can still expect to cross state lines with some frequency. Indeed, rideshare drivers can effectively be required, or at least strongly incentivized, to ferry passengers across state lines. Lyft passengers "may choose any destination within 100 miles of their pick-up location, irrespective of the state of the destination." Compl. ¶ 42. Drivers cannot see the passenger's chosen location until they accept the trip. Islam Decl. ¶ 14. At that point, the driver may cancel the trip, but not without risking a penalty, *see* Dkt. 24-3 at 4, such that "no driver [has] the option to exclude performing interstate trips, without risking further exposure to

---

[5] Plaintiff's personal experiences are not necessarily universal, but it stands to reason that, given the likelihood that on average interstate trips will be longer than intrastate trips, Plaintiff's "personal exploits . . . indicate the activities performed by the overall class." *Rogers*, 452 F.Supp 3d at 915.

deactivation," Compl. ¶ 47. Taken together, these facts establish that, even if interstate transportation is not the predominant daily service provided by rideshare drivers, it is nonetheless an important component of what they do. *Cf. Williams v. Tri-State Biodiesel, L.L.C.*, No. 13 CIV. 5041 (GWG), 2015 WL 305362, at *8 (S.D.N.Y. Jan. 23, 2015) (a driver is engaged in interstate commerce for purposes of the FLSA's motor carrier exemption when "the employee could reasonably have expected to drive in interstate commerce"); *Kennedy v. Equity Transp. Co.*, No. 14-CV-0864 (DEP), 2015 WL 6392755, at *5 (N.D.N.Y. Oct. 22, 2015) ("One way in which interstate travel can be a natural, integral, and inseparable part of an employee's position [for purposes of the FLSA's motor carrier exemption] is when any employee may be required to perform interstate travel, regardless of the actual time spent by employees individually on interstate travel."). For these reasons, the Court finds that rideshare drivers for companies like Lyft and Uber, as a nationwide class, perform sufficient numbers of interstate rides, with sufficient regularity, to make them "engaged in" interstate commerce.

## C. Rideshare Drivers' Role in Interstate Commerce Also Includes Driving Passengers to and From Hubs of Interstate Travel

The analysis could end there, but the Court notes that its conclusion is bolstered, if not independently justified, by the fact that the nationwide class of rideshare drivers frequently transports passengers to airports, train stations, and other hubs of interstate travel. Plaintiff cites evidence that in 2018, 15 percent of Uber's revenue from ridesharing came from trips that began or ended at an airport. *See* United States Securities and Exchange Commission, Form S-1 Registration Statement of Uber Technologies, Inc., April 11, 2019, at 38, available at https://www.sec.gov/Archives/edgar/data/1543151/000119312519103850/d647752ds1.htm (last visited March 3, 2021); *see also Capriole*, 460 F. Supp. 3d at 930 ("Uber has provided data indicating that 10.1% of all Uber trips taken in the United States in 2019 began or ended at an

airport."). Plaintiff also references his own estimates that his trips to airports, trains, and bus stations constitute about 25 percent of his total Lyft trips. Islam Decl. ¶¶ 8–10. In Plaintiff's telling, these facts make rideshare drivers akin to the local Amazon delivery drivers found by the *Waithaka* and *Rittman* courts to be engaged in interstate commerce, notwithstanding the fact that these drivers did not personally cross state lines.

In *Waithaka*, as discussed above, the First Circuit held that Amazon's "AmFlex" delivery drivers—workers who locally deliver Amazon packages on the final legs of their interstate journeys—are as a class "engaged in" interstate commerce pursuant to 9 U.S.C. 1. The First Circuit agreed with the plaintiff that "[w]hen the FAA was enacted in 1925, . . . there was an understanding that workers could be 'engaged in . . . interstate commerce' without crossing state lines; rather, this phrase included workers who transported goods or passengers (or facilitated the transportation of goods and passengers) within a single state that were ultimately going to or coming from another state." *Waithaka*, 966 F.3d at 18 (internal quotation marks omitted). To reach this conclusion, the First Circuit analyzed contemporaneous statutes from the time of the enactment of the FAA, including the Federal Employers' Liability Act. It noted that under that statute, railroad employees were considered to be "engaged in interstate commerce" even without moving across state lines if they "transported goods or passengers that were moving interstate." *Id*. at 20 (citations omitted). The First Circuit also considered the "geographic footprint and nature of [Amazon's] business," *id*. at 22, and concluded that "[b]y virtue of their work transporting goods or people within the flow of interstate commerce, Waithaka and other AmFlex workers are 'a class of workers engaged in . . . interstate commerce,'" *id*. at 26 (internal citation omitted). The Ninth Circuit reached the same conclusion in a nearly identical case. *See Rittman*, 971 F.3d at 909 (rejecting "the notion that transportation workers must actually cross state lines to be 'engaged in interstate commerce' for the [Section One] exemption to apply").

20

There are important and relevant similarities between AmFlex delivery drivers and rideshare drivers who help passengers launch or complete their interstate journeys by ferrying them to and from airports and train stations. Like the Amazon packages in *Rittman* and *Waithaka*, many Lyft and Uber passengers are "ultimately going to or coming from another state." *Waithaka*, 966 F.3d at 18. Until these passengers reach their final destinations, their movements to or from airports and train stations are "still a part of a continuous interstate transportation." *Rittman*, 971 F.3d at 916. Many intrastate Lyft rides—say, from Los Angeles International Airport to a hotel in Beverly Hills—are completing the "last mile" of the passenger's interstate or foreign travel. And like Amazon, Lyft and Uber are not local companies but ones that have a significant "geographic footprint." *Waithaka*, 966 F.3d at 22. Indeed Lyft describes itself as "one of the largest and fastest-growing transportation networks in the United States and Canada." Dkt. 28-9 at 6.[6] In this sense, when a Lyft driver takes a passenger to or from an airport or train station, she is not merely providing a local taxi ride like any other. She is working on behalf of a major national enterprise to help facilitate a passenger's journey across state lines. *See Cunningham*, 450 F. Supp. 3d at 46 (because Lyft drivers take passengers to and from Logan International Airport, they are "part of the chain of interstate commerce, enabling their passengers to leave or enter Massachusetts").

To be sure, the analogy to the AmFlex drivers only goes so far, and most courts to have considered the question have found that the fact that rideshare drivers take passengers to and from airports and train stations is not sufficient to render them "engaged in . . . interstate

---

[6] *See also* Dkt. 24-10 at 26 (Uber's Form S-1 Registration Statement) ("Our massive, efficient, and intelligent network consists of tens of millions of Drivers, consumers, restaurants, shippers, carriers, and dockless e-bikes and e-scooters, as well as underlying data, technology, and shared infrastructure. Our network becomes smarter with every trip. In over 700 cities around the world, our network powers movement at the touch of a button for millions, and we hope eventually billions, of people.").

commerce." *See Grice*, 974 F.3d at 957 n.5 (rejecting the argument that Uber drivers "perform

. . . a similar function to AmFlex workers" or that Uber shares Amazon's focus on the interstate

transport of goods or people); *Capriole*, 460 F. Supp. 3d at 932 ("Uber drivers do not perform an

integral role in a chain of interstate transportation."). Judge Chhabria held in *Rogers* that "the

fact that Lyft drivers frequently pick up and drop off people at airports and train stations [does

not] mean that they are, as a class, 'engaged in' interstate commerce," because Lyft's focus is not

on "transporting people to and from airports;" it is instead to be "a technologically advanced

taxicab company, allowing people to 'hail' rides from its drivers from pretty much anywhere to

pretty much anywhere." *Rogers*, 452 F. Supp. 3d at 916. Another salient difference between

Amazon packages and rideshare passengers is that, whereas the vast majority of Amazon

packages have likely been transported in interstate commerce, a significantly smaller share of

rideshare drivers are traveling to and from hubs of interstate travel.

Lyft also argues that the application of *Waithaka*'s and *Rittman*'s "flow of interstate"

commerce theory to rideshare driving is foreclosed by the Supreme Court's 1947 antitrust

decision in *United States v. Yellow Cab*, 332 U.S. 218 (1947), *overruled on other grounds by

Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984). In that case, the Supreme Court

considered, *inter alia*, whether for purposes of establishing liability under the Sherman Act, a

conspiracy to control local taxicab operations in Chicago was sufficiently directed at interstate

commerce. *Id*. at 230. The Court rejected the Government's argument that the taxicab companies

participated in interstate commerce by transporting passengers to railroad stations in Chicago

where they would subsequently "embark upon interstate journeys." *Id*. The Court held "that such

transportation is too unrelated to interstate commerce" because taxi companies serve all

passengers in Chicago, not just those traveling to rail stations, and because the taxi companies

have "no contractual or other arrangement with the interstate railroads." *Id*. at 230–231.

Accordingly, the taxi companies' "relationship to interstate transit is only casual and incidental"; from the perspective of the driver, a trip to the train station "is just another local fare." *Id*. at 231–232.

These arguments are well-taken, and the Court does not find that rideshare drivers' role in ferrying passengers to and from in-state airports and train stations necessarily furnishes an independent basis to conclude that rideshare drivers are "engaged in . . . interstate commerce." At the same time, the Court is not convinced that the differences between the AmFlex drivers and Lyft drivers are so stark as to render a "flow of interstate commerce" theory entirely inapplicable here, or that *Yellow Cab* altogether forecloses Plaintiff's argument. The *Yellow Cab* decision was premised on the fact that the local taxicab service was "confined to transportation between any two points within the corporate limits of the City [of Chicago]," *id*. at 230–231, and that the taxi companies had "no contractual or other arrangement with the interstate railroads," *id*. at 231. Lyft rides, as noted above, have no such restrictions, and there is at least some evidence in the record of ridesharing companies' arrangements with airports and even airlines. *See* Dkt. 34 at 8 (discussing Lyft's partnership with Delta Airlines). Moreover, in light of *Waithaka*'s instruction to consider the "geographic footprint and nature of the business for which [workers] work," 966 F.3d at 22, and *Singh*'s direction to evaluate "information regarding the industry in which the class of workers is engaged," 939 F.3d at 228, it is fair to conclude that today's national ridesharing enterprises are not in the same league as local taxi companies with respect to the role they play in interstate commerce. Accordingly, the role Lyft and Uber drivers play in ferrying passengers to and from airports and train stations at the very least lends additional support to the Court's conclusion that they are, as a class of workers, "engaged in . . . interstate commerce."

**D. Section One's Residual Category Can Apply to Workers who Transport Passengers, Not Only Those Who Transport Goods**

Finally, Lyft argues that the Section One exemption cannot apply to rideshare drivers because they provide rides to passengers instead of transporting goods. Lyft notes that the "distinction between goods and passengers has led many district courts to conclude that rideshare drivers fall outside the Section 1 exemption." Lyft. Mem. at 3. Lyft cites a case from this district, *Kowalewski v. Samandarov*, 590 F. Supp. 2d 477 (S.D.N.Y. 2008), which held that the Section One exemption does not apply to local "black car" drivers because "the involvement of physical goods [is] an indispensable element [of] being engaged in commerce in the same way that seamen and railroad workers are." 590 F. Supp. 2d 477, 483–484 (S.D.N.Y. 2008) (internal quotation marks omitted).

The Court disagrees, largely for the thorough and convincing reasons provided by the Third Circuit in *Singh* and by Judge Chhabria in *Rogers*. *See Rogers*, 452 F. Supp. 3d at 914 ("The traditional tools of statutory interpretation all point in the same direction: Section 1 is not limited to classes of workers who transport goods in interstate commerce."). In *Singh*, the Third Circuit analyzed the text of the FAA, contemporaneous statutes, legislative history, and Supreme Court precedent to conclude that "the residual clause of § 1 is not limited to transportation workers who transport goods, but may also apply to those who transport passengers, so long as they are engaged in interstate commerce or in work so closely related thereto as to be in practical effect part of it." 939 F.3d at 219. The Third Circuit began by noting that "nothing in the residual clause of § 1 suggests that it is limited to those who transport goods, to the exclusion of those who transport passengers." *Singh*, 939 F.3d at 221. In fact "the text indicates the opposite," because "seamen" and "railroad employees" have historically transported people as well as goods. *Id*. "Commerce" also plainly extends to the transportation of people and the provision of

24

services. *See id*. at 229 (Porter, J., concurring in part and concurring in the judgment) (the term

"commerce" is "not normally limited to the transportation of only physical goods"); *Rogers*, 452

F. Supp. 3d at 915–916. To that point, the Third Circuit noted that two statutes enacted

contemporaneously to the FAA, which aimed to resolve disputes involving carriers and

transportation workers, considered railway passenger cars to be carriers engaged in interstate

transportation. *Id*. at 221.

Although one statement in *Circuit City* emphasized that most courts of appeals had

found that the Section One exemption only excludes "transportation workers, defined, for

instance, as those workers 'actually engaged in the movement *of goods* in interstate commerce,'"

*Circuit City*, 532 U.S. at 112 (emphasis added and citations omitted), the Third Circuit found that

statement to be dictum, used merely to illustrate a circuit split. *Singh*, 939 F.3d at 223. The issue

in *Circuit City* and the appellate decisions it references was "whether the residual clause of § 1

covered the contracts of employment of those who were not in the transportation industry at all,"

not whether the statute distinguishes between the transportation of goods and passengers. *Id*. at

224. *See also Rogers*, 452 F. Supp. 3d at 914 ("[T]he Supreme Court and those circuit courts,

while mentioning only goods, did not expressly consider whether section 1 encompasses

passenger transportation as well."). The Court finds *Singh* and *Rogers* persuasive on this point

and accordingly adopts the view that the Section One exemption does not distinguish between

the interstate transportation of goods and passengers.

*** *

For the foregoing reasons, the Court concludes that the national class of rideshare drivers

for companies like Lyft and Uber are transportation workers engaged in interstate commerce and

therefore that they are exempt from being compelled to arbitrate under Section One of the FAA,

notwithstanding that they transport people instead of goods. Because the Court reaches this

conclusion on the basis of information already in the record, Plaintiff's cross-motion for discovery going to the interstate nature of Lyft's business, *see* Dkt. 29, is denied as moot.

## II.      State Law Provides an Alternate Basis to Compel Arbitration

The parties further dispute whether, if Plaintiff is found to be part of a class of workers engaged in interstate commerce, thus rendering the FAA inapplicable, the contract's arbitration clause can nonetheless be enforced under state law. The contract provides in relevant part that "Except as provided in Section 17, this Agreement shall be governed by the laws of the State of California without regard to choice of law principles." *See* Dkt. 13-1 at 31. Section 17 is captioned "Dispute Resolution and Arbitration Agreement," and specifically provides that the arbitration clause is "governed by the Federal Arbitration Act." *Id*. at 20.

Lyft argues that, if Plaintiff cannot be compelled to arbitrate on the basis of the FAA, state law provides an alternate basis to bind the parties to their arbitration agreement. Lyft asserts that the impact of a finding that the FAA is inapplicable is not that the arbitration agreement should be jettisoned altogether; rather, it is only that the arbitration clause is no longer governed by the body of law specified in the contract, *i.e.*, the FAA. In the absence of a choice-of-law provision to govern the arbitration clause, Lyft argues that "common-law rules for selecting the governing law apply." *See* Lyft Mem. at 24 n.10. Following those rules, Lyft contends, results in the application of New York law, as New York is the jurisdiction with the "greatest interest in the litigation." *Id*. at 24 (quoting *Valdes v. Swift Transp. Co.*, 292 F. Supp. 2d 524, 528 (S.D.N.Y. 2003)). And under New York law, Lyft urges, the arbitration clause is fully enforceable. *See Burgos v. Ne. Logistics, Inc.*, No. 15-CV-6840 (CBA) (CLP), 2017 WL 10187756, at *4 (E.D.N.Y. Mar. 30, 2017) (New York arbitration law "does not exempt transportation workers from arbitration.").

Plaintiff disagrees. He argues that the contract, by providing for the application of California law generally but not to the arbitration clause, "explicitly disclaimed the application of alternate governing law to the arbitration provision." Pl. Mem. at 24. In Plaintiff's telling, the fact that the arbitration clause is "governed by" the FAA means that it is governed "only [by] the FAA" and has force only to the extent that it is enforceable under the FAA. *Id*.[7]

Both parties point to directly relevant case law that supports their position. Lyft cites a number of cases in this circuit where the court enforced an arbitration agreement under New York law even when the FAA was found not to apply. *See Valdes*, 292 F. Supp. 2d 524 at 528; *accord Burgos*, 2017 WL 10187756, at *4; *Diaz v. Michigan Logistics Inc.*, 167 F. Supp. 3d 375, 381 (E.D.N.Y. 2016). In *Valdes*, the parties had agreed to arbitrate all disputes, but did not specify a choice of law to govern the arbitration clause. The court assumed that the FAA did not apply because the plaintiff was a transportation worker, but nonetheless held that the agreement could be enforced under New York law. 292 F. Supp. 2d at 528. Judge Chin relied on several cases holding that the inapplicability of the FAA does not mean that arbitration agreements in employment contracts are altogether unenforceable, but "only that the particular enforcement mechanisms of the FAA are not available," such that the contract is to be read "as if the [FAA]

---

[7] Plaintiff argues in the alternative that the arbitration agreement is unenforceable even under New York law, because it is a contract that requires arbitration of discrimination claims. *See* Pl. Mem at 28–29; NY CPLR § 7515 (prohibiting the enforcement of "any clause or provision in any contract which requires as a condition of the enforcement of the contract or obtaining remedies under the contract that the parties submit to mandatory arbitration to resolve any allegation or claim of discrimination."). Plaintiff does not, however, assert a discrimination claim against Lyft. Nor is the Court persuaded by Plaintiff's interpretation of Section 7515, which he does not support with relevant case law, as precluding enforcement of an arbitration clause that could under different circumstances be used to compel arbitration of a discrimination claim. As Lyft argues, "the statute declares 'null and void' only the 'prohibited clause,' which is defined as 'any clause . . . which requires . . . that the parties submit to mandatory arbitration *to resolve any allegation or claim of discrimination*,'" and the statute further provides that the inclusion of such a "prohibited clause" does not "impair the enforceability" of the remainder of the contract. Lyft Reply Mem. at 10 (citing NY CPLR § 7515(a)(2), (b)(iii) (emphasis added)).

had never been enacted." *Id.* (citing *O'Dean v. Tropicana Cruises Int'l, Inc.,* No. 98 Civ. 4543

(JSR), 1999 WL 335381, at *1 (S.D.N.Y. May 25, 1999); *Mason-Dixon Lines, Inc. v. Local

Union No. 560,* 443 F.2d 807, 809 (3d Cir. 1971)). The court proceeded to apply New York law,

as the law of state with the "greatest interest in the litigation," and compelled arbitration.

 In *Diaz*, Judge Wexler similarly enforced an arbitration clause under New York law,

despite assuming that the plaintiffs fell within the Section One exemption to the FAA. 167 F.

Supp. 3d at 380–381. In that case, unlike in *Valdes*, the contract made clear that the arbitration

provision was "governed by the Federal Arbitration Act." The court nonetheless rejected the

plaintiffs' argument that "given the parties' explicit choice to apply the FAA, the FAA is

the *only* law the Court should consider in determining whether to compel arbitration, effectively

rendering the arbitration provision unenforceable." *Id*. at 381. The court found that the arbitration

provision "clearly demonstrate[d] the parties' intent to arbitrate disputes." *Id*. As in *Valdes*, the

court applied "[f]ederal common-law choice of law rules" to arrive at the conclusion that New

York law governed the arbitration clause, and compelled Plaintiffs to arbitrate under New York

law. *Id*. at 381.

 Plaintiff relies chiefly on two cases where, as here, an arbitration clause was "governed

by" the FAA, and where the court found the clause to be unenforceable when the plaintiff was

exempt under Section One of the FAA. In *Rittman v. Amazon.com*, the case in which the Ninth

Circuit found that AmFlex drivers were engaged in interstate commerce and that the FAA was

thus inapplicable, the court rebuffed Amazon's attempt to enforce the arbitration clause under

state law. *See Rittman*, 971 F.3d at 919–921. The choice-of-law provisions in *Rittman* were

similar to those at issue here: the terms of service stated that they were controlled generally by

Washington state law, "except for [the arbitration clause], which is governed by the Federal

Arbitration Act." *Id*. at 908. Amazon argued that the effect of the FAA being found inapplicable

was that the "governed by the FAA" provision would be severed from the contract, such that

Washington state law would apply to the entire contract. *Id*. at 920. The Ninth Circuit rejected

that argument, holding that, "[i]n light of the fact that the [choice-of-law] provision expressly

treats the arbitration provision differently," applying Washington state law would amount to

"rewrit[ing] the contract." *Id*. Noting that it was unclear whether "the parties intended to apply

Washington law to the arbitration provision in the event the FAA did not apply," the court

"construe[d] ambiguity in the contract against Amazon to avoid that result." *Id*. "Because there is

no law that governs the arbitration provision," the Ninth Circuit concluded, "there is no valid

arbitration agreement." *Id*. at 921.

Plaintiff also relies on *Hamrick v. Partsfleet, LLC*, 411 F. Supp. 3d 1298 (M.D. Fla.

2019), in which the court held that an arbitration clause that was "governed by" the FAA—

specifically to the exclusion of state law—could not be enforced under state law when the FAA

was found to be inapplicable. With the exception of the arbitration clause, the contract in that

case was generally to be "governed by and construed in accordance with the laws of the state in

which" services were performed. Judge Berger held as follows:

> The parties' Agreements provide, generally, that the Agreement will be subject to state
> law. However, the Arbitration Provision specifies that, "[t]his Arbitration Provision
> is *governed by* the Federal Arbitration Act." In interpreting contracts, "[w]hen two
> contract terms conflict, the specific term controls over the general one." *United States v.
> Pielago*, 135 F.3d 703, 710 (11th Cir. 1998). Here, the election of governing law
> generally applies to the Agreements, but the Arbitration Provision itself specifically
> elects to apply the FAA. Because the more specific provision controls, the Arbitration
> Provision cannot be interpreted pursuant to applicable state law and must rise or fall on
> the application of the FAA.

*Id*. at 1302. Because the arbitration agreement was not enforceable under the FAA, and because

the contract rejected the application of state law to the arbitration agreement, the court denied the

motion to compel arbitration.

The Court agrees with Lyft. As a general matter, the inapplicability of the FAA does not render an arbitration clause void when it is otherwise enforceable under state law. *See Valdes*, 292 F. Supp. 2d at 528, 529 (the Section One exemption is "merely an exemption" and not a "substantive pronouncement that [arbitration] clauses in transportation workers' contracts are unenforceable"); *Burgos*, 2017 WL 10187756, at *4 ("[T]he inapplicability of the FAA does not render a parties' agreement to arbitrate unenforceable"). In this case, the fact that the arbitration clause is "governed by the FAA" does not compel a different result, because it does not plausibly suggest that the parties intended for the clause to be discarded in the event that the FAA was found inapplicable. The language of the contract, which repeatedly emphasizes that the parties "agree[d] to waive [their] respective rights to resolution of disputes in a court of law," *see infra* at 2–3, "clearly demonstrates the parties' intent to arbitrate disputes," *Diaz*, 167 F. Supp. 3d at 381. Accordingly, the effect of the FAA being found inapplicable is only that the arbitration clause contains no choice-of-law provision, and therefore that "the law of the jurisdiction having the greatest interest in the litigation will be applied." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012) (citation omitted). Because Plaintiff is a New York City-based Lyft driver bringing suit on behalf of other such drivers, "New York clearly has the greatest interest in the litigation," and therefore "New York arbitration law applies." *Diaz*, 167 F. Supp 3d. at 381. "New York law favors arbitration, 'interfering as little as possible with the freedom of consenting parties' to submit disputes to arbitration.'" *Id*. (quoting *Bd. of Educ. of Bloomfield Cent. Sch. Dist. v. Christa Const., Inc.*, 80 N.Y.2d 1031, 1032 (1992)). Accordingly, the Court finds that New York law provides an alternate basis to compel arbitration.

*Rittman* is not to the contrary. In that case, the problem with applying Washington law as an alternate basis to compel arbitration was that "the parties [had] explicitly contracted for Washington law to *not* apply to the Arbitration Provision." *Rittmann v. Amazon.com, Inc.*, 383 F.

Supp. 3d 1196, 1202 (W.D. Wash. 2019) (district court opinion). Applying Washington law after the parties made clear in the contract that it did not apply to the arbitration clause would have amounted to "rewrit[ing] the contract." *Rittman*, 971 F.3d at 920. Here, by contrast, the contract specifically provided that *California* law should not apply to the arbitration agreement, but said nothing about the applicability of New York law in the event that the FAA was found not to apply. There is accordingly nothing improper about applying standard choice-of-law principles to reach the conclusion that New York law applies to the arbitration agreement in the absence of the FAA.

## CONCLUSION

For the foregoing reasons, Defendant's motion to compel arbitration and to stay the litigation is granted, and Plaintiff's motion for discovery is denied as moot. The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 11 and 29, and to stay the proceedings pending the resolution of arbitration. *See Katz v. Cellco Partnership*, 794 F.3d 341, 344–347 (2d Cir. 2015).

SO ORDERED.

Dated:    March 9, 2021
          New York, New York

Ronnie Abrams
United States District Judge